**RALPH HOAR & ASSOCIATES,**
et al., Plaintiffs,

v.

**NATIONAL HIGHWAY TRAFFIC
SAFETY ADMINISTRATION,**
Defendant.

No. CIV. A. 95-959 (GK).

United States District Court,
District of Columbia.

May 30, 1997.

Katherine Anne Meyer, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Anne L. Weismann, Patricia M. Russotto, U.S. Dept. of Justice, Civil Div., Washington, DC, for Defendant.

## MEMORANDUM OPINION

KESSLER, District Judge.

This matter is before the court on Plaintiffs' Motion for Award of Reasonable Attorneys' Fees and Costs [#30] pursuant to 5 U.S.C. § 552(a)(4)(E). Plaintiffs filed this Freedom of Information Act ("FOIA") action on May 23, 1995, seeking the release of crash test videotapes of Chrysler minivans and related materials from Defendant National Highway Traffic Safety Administration ("NHTSA"). NHTSA eventually released the videotapes and information without being ordered to do so by the Court. Plaintiffs contend that they are prevailing parties within the meaning of FOIA's attorneys' fees provision and request attorneys' fees and costs associated with the suit and the preparation of their fee petition. Upon consideration of the Motion, the Opposition thereto, the Reply, the various supplemental pleadings filed herein, the applicable case law, and the entire record in this case, the Court concludes that Plaintiffs' Motion must be **granted.**

### I. *Background*

Plaintiff Ralph Hoar & Associates ("RHA") is an organization that represents several families of victims of Chrysler minivan accidents involving the liftgate latch. The individual Plaintiffs are parents of children who were injured when the liftgate latch of a Chrysler minivan popped open during an accident. Compl. ¶¶ 3–5.

In September 1993, NHTSA's Office of Defects Investigation ("ODI") began investigating whether the rear liftgate latches on Chrysler minivans were defective. By October 1994, NHTSA had received reports of 65 ejections, including 21 fatalities and 45 injuries, and had amassed other evidence, including its own internal test data, showing the existence of a safety defect in the latches. After conducting some investigations, ODI determined that the "the latch is a safety defect that involves children." Copy of Materials shown to Chrysler Officials, Pls.' Ex. C, at 2, 20, 58.

NHTSA and Chrysler met on October 27, 1994. At that time, Chrysler informed NHTSA that, although it was not convinced that the minivans had a safety defect, it might undertake a voluntary recall if NHTSA shared its internal analysis and tests with Chrysler. Decl. of Kathleen DeMeter ¶ 6, Attached to Def.'s Mot. for Protective Order; NHTSA Letter to Lewis Goldfarb (Nov. 10, 1994), Pls.' Ex. D. By letter dated November 10, 1994, NHTSA informed Chrysler that, "[a]lthough NHTSA does not ordinarily share the results of its analysis or testing with a manufacturer before the completion of an [engineering analysis]", it was prepared to do so to attempt to persuade

Chrysler to conduct a voluntary recall of the minivans. Goldfarb Letter; DeMeter Decl. ¶¶ 6–7.

On November 17, 1994, ODI staff met with Chrysler officials in Washington, D.C. NHTSA officials briefed Chrysler on the status of the investigation and described the data analysis and testing that it had already performed. ODI also showed a videotape of excerpts from filmed crash tests performed by NHTSA on Chrysler and other minivans. DeMeter Decl. ¶ 8. Although Chrysler officials were permitted to take notes, they were not allowed to take any of the materials prepared by ODI with them at the conclusion of the meeting. Second Decl. of Kathleen DeMeter ¶ 8, Def.'s Ex. A. NHTSA still did not inform the public of ODI's preliminary conclusion that a safety defect existed in the latches.

NHTSA's efforts failed to convince Chrysler to undertake a voluntary recall. On January 31, 1995, Chrysler issued a press release in which it claimed that NHTSA's crash tests, still undisclosed to the public, were "flawed". Jan. 31, 1995, Chrysler Press Release, Pls.' Ex. F.

On February 1, 1995, RHA submitted a FOIA request to NHTSA for access to "all documentation that to date supports NHTSA's defect investigation of Chrysler minivan liftgate latches", including "all agency analyses and crash tests that have been disclosed to Chrysler". Letter to Dr. Martinez, Pls.' Ex. H. On February 21, 1995, NHTSA denied the request, claiming that all of the information was exempt under FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A). That exemption allows an agency to withhold "investigatory records compiled for a law enforcement proceeding," but only to the extent that disclosure "could reasonably be expected to interfere with enforcement proceedings". By letter dated March 14, 1995, RHA appealed the denial of its request. RHA claimed that since the purpose of Exemption 7(A) is to "prevent harm to the government's 'case in court' ... by not allowing litigants 'earlier or greater access' to agency investigatory files than they would otherwise have", disclosure of information already shown to Chrysler would not interfere with that purpose. FOIA Appeal, Pls.' Ex. K.

Meanwhile, NHTSA and Chrysler worked toward a resolution that would not require a formal recall. NHTSA and Chrysler agreed that the company would replace the latches on its minivans at no charge to minivan owners. The replacement offer would be part of a voluntary "service campaign" rather than a recall. In exchange for that promise, NHTSA agreed that it would not issue a formal determination that the problem was a safety-related "defect" requiring a recall under federal law. 2d DeMeter Decl. ¶ 12.

On March 27, 1995, both NHTSA and Chrysler issued press releases announcing that Chrysler had voluntarily agreed to provide a cost-free replacement of the latches as part of a service campaign. *Id.*; Mar. 27, 1995, NHTSA Stmt., Pls.' Ex. N. The NHTSA press release stated that it intended to work with Chrysler to ensure that Chrysler minivan owners would be made aware of the campaign and avail themselves of the opportunity to have the new latches installed. The statement further stated that NHTSA's investigation would remain open so that NHTSA could monitor Chrysler's campaign. Mar. 27, 1995 NHTSA Stmt.

Chrysler's press release stated that NHTSA had not concluded that the latches were defective and that "Chrysler minivans are among the safest of all minivans." It further stated that Chrysler would begin notifying minivan owners of its offer to replace the latches "[b]y the end of the week" and that the new latches would be available within "several months." March 27, 1997, Press Release, Pls.' Ex. P. Chrysler also launched a national advertising campaign, stressing that it undertook the service campaign not because its minivans were unsafe, but because of "concerns" about the safety of the latches that may have been generated in the media. *See Wall Street Journal* (March 28, 1995), Pls.' Ex. Q; *New York Times,* Pls.' Ex. L. Chrysler intended to use latches already in use in model year 1995 minivans to replace the potentially hazardous latches in the earlier model minivans.

By letter dated March 29, 1995, Ralph Hoar wrote to the NHTSA Administrator urging him to "release all of the information that the agency has gathered during the investigation, especially the results of the crash tests, so that the public can make its own fully-informed decision about the urgency associated with replacing their Chrysler minivan latches." Mr. Hoar felt this was necessary because Chrysler was "sending van owners a mixed message by offering to replace latches while claiming there is nothing wrong with [them]." Mar. 29, 1995, Letter to Dr. Martinez, Pls.' Ex. R.

Because NHTSA had not ordered a recall, the notice that Chrysler sent to consumers did not have to state that the problem with the latches was a safety related defect or disclose the risk associated with the defect. *See* 49 U.S.C. § 30119. Chrysler sent a form letter dated March 31, 1995, to minivan owners, stating that Chrysler's decision to conduct the service campaign was based on its desire to give owners peace of mind because of "recent and highly visible media coverage questioning the safety of liftgate latches on 1984–1994 Chrysler ... minivans" which "may have raised concern among some of the four million owners of [these] minivans." The letter went on to state that NHTSA had been unable to conclude "that a safety defect exists with minivan latches" and that the minivans were completely safe. Chrysler Letter to Minivan Owners, Pls.' Ex. S.

In early April 1995, NHTSA identified a new problem with the remote release solenoid, a component of the latch on model year 1995 minivans. 2d DeMeter Decl. ¶ 14. On April 27, 1995, NHTSA and Chrysler announced that Chrysler would expand its service campaign to include the solenoid and the additional 1.5 minivans manufactured in 1995. Apr. 27, 1995, NHTSA Stmt., Pls.' Ex. U; 2d DeMeter Decl. ¶ 14. However, this problem required that the remote release latches be extensively redesigned. 2d DeMeter Decl. ¶ 14; Decl. of William A. Boehly ¶ 6, Def.'s Ex. B.

RHA's FOIA appeal was denied on April 25, 1995. NHTSA claimed that the release of the information shown to Chrysler would interfere with NHTSA's efforts to gather information by "unduly focussing public attention on the alleged defect in the Chrysler minivans." However, the agency stated that it would release the test reports to the public at the conclusion of its investigation. Pls.' Ex. X.

Plaintiffs brought this FOIA action in May 1995, seeking to compel NHTSA to disclose crash test videotapes of Chrysler minivans and related materials. Chrysler filed a motion to intervene as a defendant.

On July 10, 1995, the Court held a hearing on Chrysler's motion. At that hearing, Chrysler's attorney asserted that releasing the tapes before implementation of the service campaign would lead to public criticism of Chrysler because Chrysler was not ready to install new latches in 4.3 million affected minivans. Counsel stated that "the demand to get replacements will so outstrip ability to make the replacements, that further concern and critical disruption will be made." Tr. of July 10, 1995, Hr'g at 19–20, Pls.' Ex. Y, Def.'s Ex. F.[1]

The Court denied Chrysler's motion to intervene and expressed concern that the litigation proceed because of the safety issues involved. The Court observed that the Plaintiffs' arguments in favor of release as soon as possible were "strong." *Id.* at 20–26. At that time, counsel for Plaintiffs explained that NHTSA had agreed to give Plaintiffs a list of the materials shown to Chrysler at the November 1994 meeting and that Plaintiffs wished to take discovery to garner support for their position that the materials were not exempt from disclosure pursuant to FOIA Exemption 7(A). The Court then set a briefing schedule on the discovery issue. *Id.* at 25–28.

In early August 1995, after receiving the list of materials from NHTSA, Plaintiffs noticed the depositions of the ODI engineer responsible for the Chrysler minivan investigation and NHTSA's Deputy Administrator.

---

1. The Court summed up Chrysler's concerns, stating, "I think what I really hear you saying is that if these tapes were released the public would get so scared that they would all go dashing to their Chrysler dealer and say that they want [their] latch replaced tomorrow." *Id.* at 20.

Pls.' Ex. Z. Plaintiffs sought discovery to bolster their position that, in light of the resolution reached by NHTSA and Chrysler, there was no longer a "concrete prospective law enforcement proceeding" to which the crash test tapes related, as required to invoke FOIA Exemption 7(A). *See* Pls.' Opp'n to Def.'s Mot. for Protective Order. On August 8, 1995, NHTSA filed a motion for protective order, stating that the Chrysler investigation "remains open in order to assure Chrysler's compliance with its promised service campaign and to allow the agency prompt recourse to stronger measures if necessary." NHTSA asserted that disclosure of the crash test tapes could "interfere" with its enforcement efforts. Plaintiffs opposed NHTSA's motion.

Several days before NHTSA's Reply brief in support of its motion for a protective order was due, NHTSA proposed a "stay" of the litigation while the agency tested Chrysler's replacement latch. *See* Tr. of Aug. 28, 1995, Hr'g at 1–6, Pls.' Ex. AA, Def.'s Ex. G. NHTSA stated that it would close its investigation after it performed metallurgical tests on the replacement latch, rather than waiting until it was assured that enough minivan owners had in fact had their latches replaced. *Id.* at 6–7. At that time, Chrysler had not yet even notified any van owners that they could have their latches replaced and had yet to replace a single latch. *Id.* at 10. NHTSA successfully tested prototypes of the replacement latches on August 10, 1995. 2d DeMeter Decl. ¶ 19.

Although NHTSA was satisfied that the replacement latches met its safety concerns, it would not close the investigation without a commitment from Chrysler that the company would conduct its service campaign in a way that would result in a large number of minivan owners having their latches replaced. Tr. of Aug. 28, 1995, Hr'g at 7.

At a status hearing on August 28, 1995, the parties placed their qualified agreement to stay the litigation on the record. Counsel for NHTSA stated that it expected its testing to be completed by mid-October and, if the latch was adequate, would close its investigation and release to Plaintiffs all of the information that it had shown Chrysler in 1994.

*Id.* at 3–8. The Court expressed concerns about the fact that no replacement latches had been installed, asking, "So that from the time of this announced agreement [Chrysler's service campaign] in March until at least October, and knowing the way the world works I think it's fair to say November, maybe December, for that period of time no owner of these vans would even be able to take advantage of the Chrysler 'offer'? . . . So we are talking about an eight- or nine-month delay between the time of an announcement that got a whole lot of publicity, I think it's fair to say favorable publicity for the government and the manufacturer, and the time in which any consumer can actually take advantage of their offer in order to make their vehicle safer for themselves and their family?" *Id.* at 10–11. Rather than waiting to see if NHTSA released the information by mid-October and then proceeding, the Court set an expedited briefing schedule for resolution of the case. The Court did not rule on NHTSA's outstanding motion for protective order, although it did state that it was unlikely to grant discovery in light of the applicable case law. *Id.* at 14–16.

On October 17, 1995, counsel for NHTSA informed Plaintiffs that the new latch was adequate and that the investigation would be closed. Def.'s Opp'n at 12; Pls.' Mot. at 19. By letter dated October 18, 1995, Chrysler responded to NHTSA's concerns, committing itself to conduct the campaign to "achieve a rate of response comparable to or better than what NHTSA has considered acceptable in the past." 2d DeMeter Decl. ¶ 25. On October 25, 1995, at the same time that it made copies of the materials shown to Chrysler in November 1994 available to Plaintiffs, NHTSA held a press conference announcing the closing of the investigation. Although it accepted Chrysler's service campaign and did not push for a formal recall, NHTSA emphasized that the latch problem was a "safety issue that demands attention by Chrysler minivan owners." Oct. 15, 1995 NHTSA Press Release, Pls.' Ex. CC. NHTSA's Administrator also played portions of the crash test tape, which NHTSA had provided to the media. *Wall Street Journal,* Oct. 16, 1995, Pls.' Ex. DD. Although NHTSA did not

release the crash test videotapes to the public until October 25, 1995, excerpts of the video were shown on television on October 24, 1995. NHTSA contends that RHA supplied the videotape and that RHA had the videotape for some months before its public release. Decl. of Timothy Hurd ¶ 5, Def.'s Ex. C. Plaintiffs vigorously dispute this assertion. Suppl.Aff. of Ralph Hoar ¶ 3, Attached to Pls.' Reply.

As of December 31, 1995, Chrysler had notified only fourteen percent of the 4.3 million minivan owners that they could bring their vans to a dealer to obtain a stronger replacement latch. Only twelve percent of those consumers had the new latch installed. Chrysler First Quarterly Rep., Pls.' Ex. BB. This rate is far below the 68 percent rate achieved through formal recalls. *Wall Street Journal*, Oct. 26, 1995, Pls.' Ex. DD; *New York Times*, March 28, 1995, Pls.' Ex. L. Of the 4.3 million minivan latches that Chrysler agreed to replace, Chrysler had replaced only about two percent. Chrysler First Quarterly Report.

By stipulation dated December 22, 1995, the parties agreed to dismiss the case. However, the Court retained jurisdiction over the issue of fees and costs and, on January 3, 1996, entered an Order to that effect. Plaintiffs filed the present Motion for Award of Reasonable Attorneys' Fees and Costs on March 5, 1996, along with appropriate supporting documentation showing the number of hours expended and the type of work performed; briefing on the Motion was completed in early November, 1996. They seek $20,958.95 in fees and $2,647.08 in costs associated with litigating the case, $23,88.50 in fees and $390.71 in costs associated with the fee petition, and $4,876.67 in fees and $102.17 in costs associated with opposing NHTSA's Motion to Strike the fee petition, for a total request of $52,863.08.

## II. *Analysis*

■ Analysis of a section 552(a)(4)(E) motion for fees and costs requires a determination of both eligibility and entitlement to the award. *See, e.g., Chesapeake Bay Found., Inc. v. United States Dep't of Agric.*, 11 F.3d 211, 215–16 (D.C.Cir.1993) (citation omitted),

*cert. denied*, 513 U.S. 927, 115 S.Ct. 315, 130 L.Ed.2d 277 (1994); *Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 587 (D.C.Cir. 1981) (citations omitted).

NHTSA opposes Plaintiffs' fee application on three grounds: (1) that Plaintiffs are not eligible for an award of attorneys' fees because their suit was not necessary to gain release of the materials sought and did not influence NHTSA's decision to release them; (2) that Plaintiffs are not entitled to an award of attorneys' fees because the balance of equities under the statute does not support such an award; and (3) that, if attorneys' fees are awarded, Plaintiffs should not recover fees and costs associated with discovery and intervention issues.

### A. Eligibility for Attorneys' Fees

■ A FOIA plaintiff is eligible for an award of attorneys' fees if it has substantially prevailed in its suit. In the absence of a court order, whether a plaintiff has substantially prevailed is determined by whether the lawsuit was reasonably necessary and whether the institution and prosecution of the case substantially caused the agency to release the documents at issue. *See e.g., Chesapeake Bay Found., supra*, 11 F.3d at 216; *Church of Scientology, supra*, 653 F.2d at 587; *Nationwide Bldg. Maintenance, Inc. v. Sampson*, 559 F.2d 704 (D.C.Cir.1977). NHTSA contends that Plaintiffs' suit was not necessary and that it did not cause the release of the materials.

■ Reasonable necessity is determined from the perspective of a reasonable person in the position of the requester. *Fund for Constitutional Gov't v. National Archives & Records*, 656 F.2d 856, 872 (D.C.Cir.1981). There is no doubt that Plaintiffs believed that this information was of great public importance. Despite NHTSA's statement that it did not intend to withhold the materials indefinitely, the history of attempts to secure release of the information clearly shows that it was not unreasonable for Plaintiffs to conclude that only a lawsuit would result in unconditional release of the requested information by NHTSA. *Accord Save Our Cumberland Mountains, Inc. v. Hodel*,

826 F.2d 43, 51 (D.C.Cir.1987) (noting that there is nothing to require an agency to follow up on a promise to take a particular action).

RHA's initial attempts at obtaining disclosure were unsuccessful. Before the lawsuit, NHTSA claimed that it would not close its investigation of Chrysler and, thus, disclose the relevant information, until Chrysler's service campaign resulted in enough minivan owners receiving new latches. It was not until Plaintiffs filed a lawsuit challenging NHTSA's Exemption 7(A) withholding and pushed for discovery on that issue that NHTSA moved up the date for closing the investigation and disclosing the materials. As Plaintiffs point out, such a change in position has often been held adequate to demonstrate that the lawsuit was necessary to compel production of the requested materials and that a causal nexus between the events existed. See Church of Scientology, 653 F.2d at 588; Chesapeake Bay Found., 11 F.3d at 216.

Defendant argues that an intervening change in circumstances, not Plaintiffs' lawsuit, caused its change in position. After Chrysler announced the service campaign, NHTSA kept the investigation open to monitor the campaign because of concerns that it might have to proceed to a formal defect determination to compel an adequate remedy. At that time, Chrysler planned to use the latch that was in use on its model year 1995 minivans, meaning that no redesign would be necessary before Chrysler could start replacing latches. However, NHTSA identified a problem with those 1995 latches and Chrysler expanded the service campaign to include their replacement. NHTSA contends that, because of the need to design new latches, its safety concerns could be met by merely making sure the latches were tested, rather than by waiting to ensure that a sufficient number of minivan owners actually had the new, safe latches installed. This contention, however, is unpersuasive in light of the fact that, at the time Chrysler initially announced the service campaign, NHTSA did not feel the need to test the 1995 latch which would be used as the replacement but, rather, seemed intent on ensuring that consum-

ers actually took advantage of Chrysler's replacement offer.

This conclusion is strengthened by an analysis of NHTSA's stated reason for withholding the information. Initially, NHTSA claimed that release of the documents would jeopardize its own enforcement proceedings should Chrysler's service campaign prove unsuccessful. In making that claim, it relied in large part on United States v. General Motors Corp., 841 F.2d 400 (D.C.Cir.1988), a case where our Court of Appeals held that consumer complaint evidence alone was insufficiently reliable to support an enforcement proceeding. Id. at 409. In addition, the Court of Appeals shared the district court's concern that publicity of the alleged vehicle defect prior to the conclusion of NHTSA's investigation may have contributed to the high consumer complaint rate on which the government's case was built. Id. at 414.

However, the facts of the General Motors case varied significantly from those in this case, undercutting the credibility of NHTSA's reliance on that case to support its decision to withhold. In this case, unlike in General Motors, NHTSA had conducted its own engineering analysis, statistical analysis, and crash tests showing the problems with Chrysler's minivan latch. If NHTSA later brought an enforcement proceeding against Chrysler, the government would have substantial, objective data, in addition to consumer complaints, on which to rely. Thus, it is unclear how release of the information sought by Plaintiffs would have affected any future enforcement proceedings by NHTSA.

Further, over the course of Plaintiffs' attempt to obtain release of the materials, Defendant's position on their release changed considerably. During the major portion of Plaintiffs' attempt to obtain the materials, NHTSA's opposed release of the materials on, essentially, fear-of-publicity grounds. By the end of the litigation and, in particular, after Plaintiffs' aggressive litigation of the discovery issues, NHTSA not only released the materials, but held a widely-publicized press conference to announce their release. This almost complete reversal in position belies NHTSA's assertion that publicity would

8

jeopardize its enforcement proceedings if Chrysler's service campaign ultimately proved unsuccessful.

Quite simply, NHTSA has not provided an adequate rationale for such a dramatic change in its safety and enforcement concerns over the course of the litigation. For these reasons, the Court finds that Plaintiffs' lawsuit was reasonably necessary to obtain release of the materials at issue. Thus, Plaintiffs are eligible for an award of attorneys' fees.

### B. Entitlement to Attorneys' Fees

█ Once a plaintiff has been found eligible for attorneys' fees, the Court must determine whether the plaintiff is also entitled to such an award. Four criteria are considered in determining whether the Court should award attorneys' fees: (1) the benefit to the public, if any, derived from the case; (2) the commercial benefit to the complainant; (3) the nature of the complainant's interest in the records sought; and (4) whether the government's withholding of the records had a reasonable basis in law. *Cuneo v. Rumsfeld,* 553 F.2d 1360, 1364, 1365–66 (D.C.Cir. 1977); *Chesapeake Bay Found.,* 11 F.3d at 216 (citations omitted). Our Court of Appeals has cautioned that a district court must "always keep in mind the basic policy of the FOIA to encourage the maximum feasible public access to government information and the fundamental purpose of section 552(a)(4)(E) to facilitate citizen access to the courts to vindicate their statutory rights." *Nationwide Bldg. Maintenance,* 559 F.2d at 715.

█ The public interest in the information at issue in this case was, without question, very great.[2] The tapes showed, in very graphic terms, the extent of the problem associated with the minivan latch and the dangers associated with ejection from the

vehicle if the latch did not operate properly. The airing of the tapes would increase public knowledge of the latch problem and the likelihood that minivan owners would take advantage of Chrysler's offer to replace their latches. This dissemination of information to the public was particularly needed because of Chrysler's repeated, well-publicized statements that the latches were not defective and that the minivans were safe. Further, after NHTSA released the information, it was in fact widely disseminated. Because of the significant impact of such information on public safety, this type of benefit falls squarely within the parameters established by FOIA. *See Nationwide Building Maintenance,* 559 F.2d at 712–13 (fees generally awarded to public interest groups seeking information to further a project benefitting the general public interest, but not for a private business seeking data on a competitor) (quoting S.Rep. No. 93–854, 93d Cong., 2d Sess. (1974) at 19).

NHTSA argues that Plaintiffs' suit produced no public benefit. First, it contends that the videotape had been in the public domain for some time before the actual disclosure of the materials, a contention vigorously disputed by Plaintiffs. This assertion strains credulity given the fact that disclosure of the videotape, and related materials, was the central thrust of Plaintiffs' case. Even if Defendant's assertion were true, the publicity accompanying disclosure, and the fact that the information was so widely disseminated after disclosure, demonstrate a benefit to the public from Plaintiffs' suit. Second, NHTSA claims that disclosure jeopardized its ability to seek a formal defect determination. In addition to the reasons discussed above, this argument is unconvincing because there is no evidence that NHTSA ever undertook a formal defect determination and no evidence that it rejected

---

2. The Court expressed this view many times during the course of the proceedings in this case: "[Plaintiffs' arguments] in terms of seeking release as early as *possible*" "are strong." Tr. of July 10, 1995, Hr'g at 25. "[Plaintiffs' point] was certainly of general social relevance or relevance in terms of the health and welfare of people using these cars, vans". Tr. of Aug. 25, 1995, Hr'g at 9. "Why in the world has it taken

four to five months to get a prototype of these latches when you know full well that it takes months for consumers to actually get their vans in, to get the repairs made, for Chrysler to do what it's supposed to do? What in the world has taken so long while these vans are out on the road being driven by families with children in those vans?" *Id.* at 11.

this approach because of a lack of legally sufficient evidence.

The Court next considers both the commercial benefit to the Plaintiffs and the nature of their interest in the records sought. Plaintiff RHA is a firm that represents accident victims. Thus, it may derive some commercial benefit from receiving information about NHTSA's defect investigation. The individual Plaintiffs may also benefit from the information in that it may be used to redress a private wrong. However, NHTSA acknowledges that "it is impossible to know what personal pecuniary or other benefit [Plaintiffs] may stand to gain from release of the materials at issue." Opp'n at 38 n. 20.

The final criterion to be considered in the entitlement determination is whether the government's withholding of the records had a reasonable basis in law. NHTSA's reliance on the General Motors X-car case, which, as previously discussed, presented a significantly different factual scenario, is insufficient to demonstrate a reasonable basis in law for withholding pursuant to FOIA Exemption 7(A).

NHTSA also relies on *Campbell v. Department of Health & Human Servs.*, 682 F.2d 256, 265 (D.C.Cir.1982) for the proposition that a 7(A) exemption claim is not automatically defeated simply because the target of an investigation has had access to the material at issue. *Campbell*, however, does not support NHTSA's position.

In *Campbell*, a third-party made a FOIA request to the FDA for information prepared and submitted by a company that was the target of an investigation. *Id.* at 259. In response to Campbell's request, the FDA invoked FOIA Exemption 7(A). *Id.* After reviewing the legislative history of the exemption, the Court of Appeals reversed the District Court's grant of summary judgment in favor of the government and instructed the district court to "conduct a more focused and particularized review of the documentation on which the government bases its claim that ... [disclosure] would interfere with the investigation." *Id.* at 265. The Court of Appeals noted that "Campbell [wa]s not an actual or potential target of an FDA enforcement proceeding who seeks early discovery of the strength of the government's case in order to tailor his defense." *Id.* Because of that unusual fact situation, the court had a particular responsibility to insist that the agency demonstrate specifically how disclosure of the information at issue would interfere with an investigation. *Id.*

NHTSA has not made the showing required by *Campbell*. Because NHTSA had already shared the requested information with Chrysler, it is hard to see how barring public disclosure of that same information would serve the purpose of Exemption 7(A). NHTSA's act of sharing the information in the November meeting surely revealed to Chrysler, the potential target, "the scope, direction, or focus" of its inquiry. *Campbell*, 682 F.2d at 265. Thus, NHTSA did not have a colorable basis for withholding the information.

In determining a plaintiff's entitlement to attorneys' fees, the Court must balance the four criteria. Both the public interest and colorable basis for withholding criteria weigh strongly in favor of Plaintiffs. Further, the commercial benefit to the Plaintiffs and the nature of their interest in the records sought criteria are, at best, neutral. Thus, the Court finds that Plaintiffs are entitled to an award of attorneys' fees.

### C. Hourly Rates and Time Expended

The analysis of Plaintiff's request begins with consideration of the "initial estimate of a reasonable attorney's fee"—the so-called lodestar fee—which the Supreme Court has said "is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate based on the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984). Plaintiffs have, as required by *Hensley v. Eckerhart*, 461 U.S. 424, 432, 103 S.Ct. 1933, 1938–39, 76 L.Ed.2d 40 (1983), "submit[ted] evidence supporting the hours worked and the rates claimed." [3]

---

3. Although Section III of NHTSA's Opposition to Plaintiff's Motion for Award of Reasonable Attorney's Fees and Costs is entitled "Plaintiffs Seek Compensation For Hours Not Reasonably Ex-

For ease of analysis, the Court will discuss the issues with respect to each litigation activity for which Plaintiffs claim fees and costs.

NHTSA opposes the motion on the ground that the number of hours expended was unreasonable.

### 1. Litigation of the Case

█ Plaintiffs seek $20,958.95 in fees for approximately 82 hours and $2,647.08 in costs associated with litigating the case. This figure includes: 73.26 hours at $275.00 per hour for the work of a partner at counsel's firm; .33 hours at $165.00 per hour for another partner; 1 hour at $125.00 per hour for an associate; and 7.5 hours at $80.00 per hour for another associate. Defendant argues that the Court should exclude 48.08 hours spent on discovery issues and more than 6 hours spent on intervention issues because those hours were "nonproductive" and "should not have been spent at all." *Copeland v. Marshall*, 641 F.2d 880, 881 (D.C.Cir. 1980).

█ NHTSA argues that any time spent on discovery should be excluded because the courts commonly decide FOIA cases solely on the basis of the affidavits of agency officials. Although it is true that discovery is rarely granted in FOIA cases, the fact remains that the Court has the discretion to grant it when appropriate. *See, e.g., Meeropol v. Meese*, 790 F.2d 942 (D.C.Cir.1986); *Military Audit Project v. Casey*, 656 F.2d 724, 750–53 (D.C.Cir.1981). Plaintiffs' aggressive litigation of the discovery issues in this case led to its ultimate resolution. Thus, Plaintiffs are entitled to fees for the time spent on those matters.

█ NHTSA also argues that Plaintiffs are not entitled to fees on the intervention issue because Plaintiffs did not "prevail" on that issue *vis-a-vis* NHTSA. It is true that NHTSA also opposed Chrysler's intervention. However, there was no way for Plaintiffs to know if NHTSA's opposition would adequately protect their interest. No commercial party would rely on an adverse party to make its case and there is no legitimate reason why Plaintiffs should have done so here. Plaintiffs ultimately prevailed in their suit and there is no way to know what the outcome would have been had Chrysler become a party to the litigation. Thus, Plaintiffs are entitled to the fees and costs associated with Chrysler's petition to intervene.

Thus, with respect to litigating this matter, Plaintiffs are entitled to $20,958.95 in fees and $2,647.08 in costs.

### 2. Motion to Strike

After Plaintiffs filed their fee motion, NHTSA filed a Motion to Strike their pleading. After NHTSA's motion was briefed, the Court found that it was entirely without merit. Plaintiffs have submitted documentation showing that the legal work associated with opposing Defendant's motion had a value of $4,876.67 in fees[4] and that $102.17 in costs was incurred. Plaintiffs are clearly entitled to an award for opposing, and prevailing against, Defendant's Motion to Strike.

### 3. Attorneys' Fees Petition

Finally, Plaintiffs seek $23,88.50 in fees[5] and $390.71 in costs associated with the fee

---

pended At Unreasonable Hourly Rate", NHTSA nowhere challenges the actual hourly rates submitted by Plaintiffs. As the supporting affidavits provided by Plaintiffs show, Plaintiffs are requesting hourly rates which are within or below market for the level of experience and expertise of the attorneys. *See* Aff. of Burt Braverman; Aff. of Stephen Braga. Further, the rates fall squarely within the *Laffey* matrix used by the U.S. Attorney's Office. *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.Cir.1984), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). Consequently, the Court concludes that the hourly rate sought by Plaintiffs is fair and reasonable.

In addition, although Defendant's Opposition takes issue with the number of hours expended

by Plaintiffs' counsel, Defendant challenges only the total number of hours spent on specific activities on the grounds that they "should not have been spent at all" and not the reasonableness of the actual hours spent. In any event, the Court finds that the time expended by Plaintiffs' counsel was reasonable.

4. This figure includes: 15.23 hours at $275.00 per hour for the work of a partner and 5.5 hours at $125.00 per hour for an associate.

5. This figure includes: 84 hours at $275.00 per hour for the work of a partner; 2.5 hours at $165.00 per hour for another partner; and 1 hour at $125.00 per hour for an associate.

petition and Reply thereto. Plaintiffs' counsel spent more than 87 hours on the legal work associated with the instant motion. Slightly more than 85 hours were spent on the litigation of this matter.

Just as "litigation is not an exact science", *Goos v. National Ass'n of Realtors,* 68 F.3d 1380, 1386 (D.C.Cir.1995), neither is the allocation of fees for successful results. Given the Court's "broad discretion", *id.* at 1384, and the entire record in this case, the Court concludes that a one-third reduction to $16,190.42 in the amount of fees requested is a fair and reasonable adjustment given the overall amount of time spent on the case.

### III. *Conclusion*

For the reasons discussed above, Plaintiffs are entitled to: $20,958.95 in fees and $2,647.08 in costs associated with litigating this case; $4,876.67 in fees and $102.17 in costs associated with opposing Defendant's Motion to Strike; and $16,190.42 in fees and $390.71 in costs associated with the fee petition, for a total of $45,166.