**OIL, CHEMICAL & ATOMIC WORKERS INTERNATIONAL UNION, AFL–CIO, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, Defendant.**

**No. CIV.A. 98–1670(GK).**

United States District Court, District of Columbia.

March 16, 2001.

Reuben Guttman, Provost & Umphrey Law Firm, L.L.P., Washington, DC, for Plaintiffs.

Anne L. Weismann, David Michael Glass, U.S. Dept. of Justice Civil Division, Washington, DC, for Defendant.

*MEMORANDUM OPINION*

KESSLER, District Judge.

This matter is before the Court on the Motion for Fees and Expenses of Plaintiffs James K. Phillips and the Oil, Chemical & Atomic Workers International Union, AFL CIO (collectively "OCAW"). Upon consideration of the Motion, Opposition, Reply, and the entire record herein, for the reasons discussed below, the Motion for Fees and Expenses [# 28] is **granted in part** and **denied in part.**

## I. Background

The United States Enrichment Corp. ("USEC") was created in 1992 as a wholly owned government corporation charged with producing enriched uranium at two gaseous diffusion plants ("GDPs") owned by the United States Department of Energy ("DOE").[1] Plaintiff OCAW, a labor union with approximately 85,000 members, was the collective bargaining agent for approximately 2,000 workers at the two GDPs operated by USEC.

In April 1996, Congress enacted the USEC Privatization Act, Pub.L. 104–134, tit. III § 3101, 110 Stat. 1321–335 (*codified at* 42 U.S.C. § 2297h–1 *et seq.*), which directed the USEC Board to transfer the federal government's interest in USEC to the private sector.[2] By June 1998, the Board was left with three options for accomplishing that objective: (1) the sale of USEC, through a merger and acquisition,

1. These GDPs, in Kentucky and Ohio, are "the nation's only operating plants which serve to enrich uranium for use in defense or civilian purposes, including nuclear power plant fuel." Pls.' Mot. for Fees and Expenses ("Pls.' Mot.") at 15.

2. On December 22, 1997, Plaintiff Phillips, then a vice president of OCAW, submitted a FOIA request to USEC, asking for records concerning the privatization of USEC, among other things. USEC responded by sending Plaintiff certain records he requested, and withholding others.

to a consortium led by the Carlyle Group; (2) the sale of USEC, through a merger and acquisition, to a consortium consisting of Texas Pacific Group and General Atomic; and (3) the sale of USEC stock to the public in an initial public offering ("IPO"). In early June 1998, the USEC Board met on three separate occasions to consider these privatization options. The meetings were closed to the public. At the end of the final meeting, on June 11, the Board voted unanimously for the IPO option. On June 29, the Board announced a proposed IPO to the public.

The very next day, Plaintiffs brought the present action (Civ.A. No. 98–1670(GK)) under the Freedom of Information Act, 5 U.S.C. § 552(a), requesting that USEC produce all records, not previously produced, that came within the scope of the Plaintiff Phillips' December 22, 1997, FOIA request. *See supra* note 2. Plaintiffs also brought a separate lawsuit (Civ.A. No. 98–1756(GK)) two weeks later, on July 14, 1998, under the Government in the Sunshine Act, 5 U.S.C. § 552b, in which they moved to enjoin USEC from closing to the public a follow-up Board meeting, scheduled for July 22. This Court denied Plaintiffs' motion, and allowed the July 22 meeting to go forward, in which three of the five USEC Board members voted to confirm the earlier decision to hold an IPO.

The IPO was held July 23 through July 28, 1998, resulting in a transfer of the federal government's ownership in USEC to the private sector. Subsequently, USEC moved for dismissal of both cases, contending that it was now a private entity and that neither FOIA nor the Government in the Sunshine Act applied to it. In response, the Court dismissed USEC from both lawsuits, ordered that DOE be substituted for USEC, and directed DOE to respond to the requests made by Plaintiffs in both lawsuits. *See* Memorandum Opinion and Order of March 18, 1999 (Civ. A. Nos. 98–1670 and 98–1756).

Defendant DOE provided Plaintiffs with certain documents in July 1998, and the parties thereafter entered into a settlement agreement. In December 1999, both cases were voluntarily dismissed, except insofar as Plaintiffs wished to seek attorneys' fees and litigation costs.[3] The parties' negotiations to settle Plaintiffs' fees and costs proved unsuccessful, and on April 17, 2000, Plaintiffs filed the present motion.

## II. Analysis

Plaintiffs bring a motion for fees and costs, pursuant to 5 U.S.C. § 552(a)(4)(E), to recover their expenses for both lawsuits.[4] Defendant contends that Plaintiffs are not entitled to an award of fees and costs or, in the alternative, that Plaintiffs are not entitled to all the compensation that they request. These contentions will be addressed in turn.

### A. Whether Plaintiffs are Entitled to *Any* Fees and Costs

Analysis of a section 552(a)(4)(E) motion requires a determination of both eligibility and entitlement to the award. *See, e.g., Ralph Hoar & Assocs. v. NHTSA*, 985 F.Supp. 1, 5 (D.D.C.1997).

3. Subsequently, OCAW merged with another union to form a new union, the Paper, Allied Industrial, Chemical and Atomic Workers International Union, AFL–CIO ("PACE").

4. Although Plaintiffs technically bring their motion under FOIA (and not under the Government in the Sunshine Act), Defendant concedes that, if the Court should find that Plaintiffs are entitled to fees and costs, Plaintiffs will be able to recover under both lawsuits. *See* Def.'s Opp'n to Pls.' Mot. for Fees and Expenses ("Def.'s Opp'n") at 11 n. 4.

However, since Defendant has not contested Plaintiffs' eligibility, the only question for the Court to consider is whether Plaintiffs are "entitled" to fees and costs. *See Chesapeake Bay Found., Inc. v. United States Dep't of Agric.,* 11 F.3d 211 (D.C.Cir.1993).

■ To determine entitlement, the Court must consider four factors: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) whether the Government had a reasonable basis for withholding requested information." *Burka v. United States Dep't of Health & Human Servs.,* 142 F.3d 1286, 1288 (D.C.Cir.1998) (internal citations and quotations omitted). The second and third factors are "closely related and often considered together." *Cotton v. Heyman,* 63 F.3d 1115, 1120 (D.C.Cir. 1995) (quoting *Tax Analysts v. United States Dep't of Justice,* 965 F.2d 1092, 1095 (D.C.Cir.1992)). In determining a plaintiff's entitlement to attorneys' fees, the Court must balance all four criteria. *Ralph Hoar & Assocs.,* 985 F.Supp. at 9.

### 1. The Public Benefit

■ To determine whether this FOIA action resulted in a public benefit, the Court asks whether Plaintiffs' victory is "likely to add to the fund of information that citizens may use in making vital political choices." *Cotton,* 63 F.3d at 1120 (quoting *Blue v. Bureau of Prisons,* 570 F.2d 529, 534 (5th Cir.1978)). In making this inquiry, it is important to remember that the "central purpose" of FOIA is "to assist our citizenry in making the informed choices so vital to the maintenance of a popular form of government." *Blue,* 570 F.2d at 533.

■ It is undisputed that USEC has experienced extreme financial and other difficulties since its privatization. *See, e.g.,* Pl.'s Mot. at 7–10 (citing testimony of Joseph Stiglitz, Shelby Brewer and numerous newspaper and magazine articles) & accompanying exhibits. It is also undisputed that by bringing the present lawsuit and Civ. A. No. 98–1756,[5] Plaintiffs have forced the public release of countless important documents relating to the privatization of USEC, including information on USEC's corporate organization (*i.e.,* bylaws, organization chart, and personnel data); the minutes and transcripts of the June–July 1998 USEC meetings which had been closed to the public; contracts entered into between USEC and lawyers, investment advisors, and consultants; and studies of a certain type of technology (referred to as "AVLIS"), which Plaintiffs allege was projected to be the cornerstone to USEC's commercial profitability.[6] *Id.* at 17–18.

Defendant argues that these and other documents do not add to the public fund of

5. The present lawsuit (Civ.A. No. 98–1670) and Civ. A. No. 98–1756 will often be collectively referred to in this Opinion as "Plaintiffs' lawsuits" or "the lawsuits."

6. Defendant does not deny that these categories of information were released because of Plaintiffs' lawsuits, but argues that substantially similar documents were requested and received by the House of Representatives' Committee on Commerce, approximately one month before Plaintiffs received the released documents. However, there is no suggestion that the House Committee made public the documents it received, so as to add to the public "fund of information." Further, it is crucial to recognize that if Plaintiffs had not brought these lawsuits when they did, the relevant documents might well have been destroyed or made otherwise unavailable, thus placing them beyond the subpoena power of any governmental body, including Congress. *See* Decl. of Richard Miller ¶ 27. There can be no doubt that Plaintiffs' lawsuits "resulted" in the documents' release.

information because they do not reveal the specific "flaws" in the privatization process which Plaintiffs allegedly point to in their Motion. *See* Def.'s Opp'n at 12. Defendant also argues that since the privatization of USEC is a *fait accompli,* documents regarding "alleged defects in the privatization process do[ ] not provide any information relevant to future action." *Id.* at 16.

The Court finds that the documents obtained by Plaintiffs, and widely disseminated to the media and the public,[7] clearly and overwhelmingly add to the growing public body of knowledge concerning the privatization of governmental entities generally, and of USEC specifically. Accordingly, Plaintiffs are entitled to attorneys' fees and costs under *Cotton* and *Blue.*

The public benefits of Plaintiffs' lawsuits are substantial. For one thing, the released documents inform the public about what "went wrong" with privatization in this case, and what procedures and criteria should be used in the future when other federal entities consider privatization. The fact that the privatization of USEC is a *fait accompli* is of little relevance. Undoubtedly, the question of whether an agency should be privatized will surface again, and the released documents in this case will assist our legislators, their respective constituents, and executive branch officials in "making vital political choices" regarding how certain government functions should be organized and how taxpayer money should be spent. *See Cotton,* 63 F.3d at 1120.

In addition, the released documents have been, and will continue to be, greatly beneficial to academic and scholarly commentators who are interested in privatization, "reinvention of government," non-proliferation policy, and/or decision-making theory. *See* Pls.' Mot. at 30–31; Decl. of Dan Guttman ¶ 14. The transcripts of the closed Board meetings—especially when viewed in conjunction with the extraordinarily favorable terms of the contracts between USEC and its lawyers and advisors—reveal the ways in which bias, self-interest, and self-dealing can influence the decision-making process, especially when that process is kept entirely secretive. *See* Pls.' Reply to Def.'s Opp'n ("Pls.' Reply") at 8–10.[8]

Defendant's contention that the USEC Board's deliberations were a "model of corporate decision-making," Def.'s Opp'n at 15 (citing a *Washington Post* article) is patently incorrect. The transcripts of the June–July 1998 meetings—which were disclosed to the public only because of Plaintiffs' lawsuits—show that the Board's deliberations were "model" only insofar as they were a model of what not to do when considering various options for privatizing a federal entity.

First, Board members were deprived of basic national security information concerning USEC—despite the fact that they were charged with ensuring that privatization did not imperil our national security. The released transcripts of the USEC Board's final meeting, in which it recommended going forward with the IPO, reveal that at least one Board member was

7. The topic of USEC privatization (and its attendant failures) has been extensively covered by the media. *See, e.g.,* Pl.'s Mot. at 8–12 & accompanying exhibits. Countless articles on the subject have appeared in a variety of publications, from mainstream newspapers and periodicals to specialized scientific journals. *Id.*

8. For example, one congressman stated: "what we know about privatization is that it was a classic case of insider enrichment. A handful of insiders got rich at the expense of national security, domestic energy security, the well being of workers, local economies, and taxpayers ..." Def.'s Opp'n, Ex. L at 6 (quoting Congressman Ted Strickland).

repeatedly denied requests for briefing from National Security staff. *See* Decl. of Richard Miller ¶ 23 (citing statements made by Board Member William Burton).[9]

Second, in deciding whether to go the IPO route to privatization, many Board members were forced to rely largely upon information provided by parties with potential conflicts of interest, all of whom strongly, not surprisingly, recommended the IPO. For example, the investment firm of J.P. Morgan was consulted as the Board's "independent" financial advisor, yet it stood to make an additional $7.5 million if the IPO went forward. Pls.' Mot. at 20. USEC's outside counsel (Skadden, Arps, Meagher & Flom) was relied upon by Board members as well, even though the law firm ended up receiving approximately $15 million for services rendered during the privatization process. *Id.* at 19 & n. 34. Most importantly, USEC's CEO, Nick Timbers—who dismissed all concerns about the viability of the AVLIS technology and strongly pushed the IPO option[10]—ended up receiving for the 1999 year "a $617,625 bonus and stock options valued at $1.7 million." Pls.' Mot. at 9–10, Ex. 1 (quoting *U.S. News & World Report* article).

With respect to the public benefit criterion, it is not necessary for the Court to inquire as to whether the decision-making process was materially or actually tainted by the influence of the parties named above (*i.e.*, that the Board would have voted differently but for those parties' influence). What is important, rather, is that the fruits of Plaintiffs' lawsuits gave numerous outside parties, including the press and Congressional watchdogs, access to vital documents that permit those groups to carefully examine and report to the public on the Board's decision-making process; these reports, as well as the released documents themselves, have already added to and will continue to "add to the fund of information that citizens may use in making vital political choices." *Cotton*, 63 F.3d at 1120.

**2. The Commercial Benefit/Nature of Plaintiffs' Interest**

Defendant argues that Plaintiffs' interest in obtaining documents relating to USEC's privatization "was the narrow one of saving the jobs of OCAW members," and that an award of attorneys' fees would therefore be inappropriate in this case. Def.'s Opp'n at 18.

The Court disagrees with this assessment. Plaintiff OCAW has a long history of undertaking litigation that benefits the public interest. *See* Pls.' Reply at 33–35. While some of its lawsuits may have been motivated in part by OCAW's concern for its own members' health and safety, that concern, as in the present lawsuit, is substantially identical to a concern for the public interest—for the protection of the environment, workers' safety and government integrity, among other things. *Id.* at 13–14; Decl. of Richard Miller ¶¶ 33–36,

9. For example, Board Member Burton stated in frustration: "I don't think we have enough information in light of [the national security] issue that has risen up. There has been a ton of press, a ton of meetings, everybody who's been involved in it except this Board, and we can't even get a briefing on them." *Id.* (quoting USEC Board transcripts, July 22, 1998, at 93).

10. After reviewing the Board meeting transcripts, Congressman Strickland noted that USEC CEO Timbers "clearly and forcefully argues for the public offering approach to privatization" during the closed door meetings, despite USEC Board Chairman Rainer's assurances that Timbers and other individuals in USEC management "would not participate significantly in the decision making process during privatization ..." Decl. of Richard Miller ¶ 25 (quoting Pls.' Mot., Ex. 8).

43–46. Indeed, the related lawsuit that OCAW brought before this Court,[11] in which it made a National Environmental Policy Act challenge to the Department of Energy's plan for the recycling of hazardous materials, resulted in a decision by Secretary of Energy Bill Richardson to significantly restrict the recycling of radioactively contaminated nickel—which certainly benefitted more than just OCAW's members. Pls.' Mot. at 35–36; Decl. of Dan Guttman ¶ 26.

Finally, even assuming that Plaintiff OCAW was in part motivated by concern for its members' livelihood, this motivation is far outweighed by the enormous public benefit that resulted from the released documents. *See Chesapeake Bay Found.*, 11 F.3d 211 (noting that the "test of entitlement involves a balance of several factors") (internal citations omitted).

**3. The Reasonableness of the Government's Basis for Withholding**

█ This final criterion asks, in part, whether the government "engaged in obdurate behavior" in withholding the requested documents. *See Tax Analysts*, 965 F.2d at 1097. Defendant contends that it was not obdurate, nor did it otherwise act in bad faith in responding to Plaintiff's request for documents. On the contrary, Defendant maintains that "[o]nce [the present] lawsuit began, the government produced with few exceptions everything that plaintiffs asked for." Def.'s Opp'n at 20.

Defendant's position is somewhat disingenuous. It was not until DOE was substituted for USEC in this lawsuit that Defendant stopped consistently withholding numerous categories of documents, including basic information about USEC's corporate organization, without any legal basis for doing so.[12] *See* Pls.' Reply at 16. Further, almost immediately after USEC was privatized, Defendant moved to dismiss both of Plaintiffs' lawsuits. Moving for dismissal is not the typical way to signal full compliance with a legitimate document request under FOIA.

In addition, it must be noted that Plaintiffs did not actually obtain the most important documents they requested (*i.e.*, the transcripts of Board meetings) until a year after privatization had been completed, thus preventing Plaintiffs from attempting to use the information in the most timely and effective fashion to argue before relevant governmental bodies the importance of delaying or reviewing the privatization of USEC.

In sum, when the four relevant criteria are properly balanced—and appropriate weight is given to the public benefit criterion—it is clear that Plaintiffs are entitled to attorneys' fees under 5 U.S.C. § 552(a)(4)(E). *See Ralph Hoar & Assocs.*, 985 F.Supp. at 9.

**B. Whether Plaintiffs are Entitled to *All* the Fees and Costs That They Seek**

Defendant makes two general arguments as to why Plaintiffs are not entitled to all the fees and costs that they seek. First, Defendant argues generally that Plaintiffs, and especially counsel Dan Guttman, are not entitled to the compensation

11. *OCAW v. Pena*, 62 F.Supp.2d 1 (D.D.C. 1999), *aff'd*, 214 F.3d 1379 (D.C.Cir.2000).

12. Other documents withheld without adequate justification include various agreements between governmental agencies and/or officials, and government contracts and agreements with lawyers, investment bankers, lobbyists, public relations consultants, and accountants. Pls.' Mot. at 39–40.

levels set by the *Laffey* Matrix.[13] Second, Defendant argues that certain expenses incurred by Plaintiffs were not warranted and should not be compensated. Each argument will be addressed in turn.

### C. Whether the *Laffey* Matrix Should Apply

The *Laffey* Matrix provides the following hourly rates for the 1999–2000 years: $340/hour for attorneys with 20 or more years of experience (which would include Dan Guttman); $295/hour for attorneys with between 11 and 19 years of experience (which would include Reuben A. Guttman); $200/hour for attorneys with between four and seven years of experience (which would include Traci L. Buschner and Brian P. McCaffrey); and $160/hour for attorneys with between one and three years of experience (which would include Charlie V. Firth). *See* Pls.' Mot. at 48–51; Decl. of Dan Guttman, Attach. 2; Def.'s Opp'n at 9.

Plaintiffs contend that their counsel have spent a total of 411.05 hours on the two cases before this Court, with the vast majority of those hours attributed to Dan Guttman.[14] Applying the *Laffey* rates, Plaintiffs request a total of $136,878 in attorneys' fees [15] and $3,096 in litigation costs.

Plaintiffs acknowledge that counsel, and particularly Mr. Guttman, generally charge their clients less than the *Laffey* rates. However, Plaintiffs contend that the *Laffey* Matrix should apply in this case because their counsel qualify as "attorneys who practice privately and for profit but at reduced rates reflecting non-economic goals." Pls.' Mot. at 41 (quoting *SOCM,* 857 F.2d at 1524).

In response, Defendant argues that the "non-economic goal" exception spelled out in *SOCM* and *Covington v. District of Columbia,* 57 F.3d 1101 (D.C.Cir.1995), is inapplicable here. Defendant contends that Plaintiffs' counsel Mr. Guttman has chosen to charge his non *pro bono* clients, including OCAW and PACE, an hourly rate substantially lower than the equivalent *Laffey* rate, and that Plaintiffs' counsel should not be entitled to compensation at *Laffey* rates which are higher than those they choose to charge their non *pro bono* clients under ordinary circumstances.

Our Court of Appeals has indicated that "the private but public-spirited rate-cutting attorney [should not] be penalized for his public spiritedness ..." *SOCM,* 857 F.2d at 1524. On the contrary, an attorney who can "show that his or her custom of charging reduced rates is in fact attributable to 'public spiritedness' " is entitled

13. The *Laffey* Matrix was established, and is updated, by the Department of Justice, to reflect the prevailing market rate for attorneys by years of practice, pursuant to *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4 (D.C.Cir. 1984), *overruled in part on other grounds by Save Our Cumberland Mountains v. Hodel,* 857 F.2d 1516 (D.C.Cir.1988) (en banc) ("*SOCM* ").

14. Plaintiffs' counsel include Dan Guttman and Reuben A. Guttman. In this Opinion, "Mr. Guttman" refers to Dan Guttman, unless otherwise noted.

15. These numbers include the additional hours documented by Dan Guttman in his supplemental declaration and attachment, which reflect the time he spent on this motion subsequent to April 17, 2000. *See* Pls.' Reply at 23–24; Supp. Decl. of Dan Guttman ¶ 6 & attach. Dan Guttman's requested hours have now increased by 45.25, from 315.25 to 360.50; Mr. Guttman's requested attorneys' fees have increased by $15,385, from $107,185 to $122,570. Plaintiffs' total requested attorneys' fees have increased from $121,493 to $136,878. Defendant has not responded to Plaintiffs' supplemental submission.

to compensation at prevailing-market (*i.e.*, *Laffey*) rates. *Covington*, 57 F.3d at 1108.

■ Plaintiffs have demonstrated, supported by uncontroverted affidavits and other evidence, that Mr. Guttman has been motivated by public spiritedness in charging clients below the prevailing market rate and in performing numerous legal-related activities entirely for free. *See* Pls.' Mot. at 42–48; Decl. of Dan Guttman at 2–8 (listing, among other things, Mr. Guttman's representation of labor unions, public interest organizations, municipalities, whistle-blowers and non-profit entities on either a *pro bono* or reduced rate basis). Further, Plaintiffs have also provided evidence, not contested by Defendant, that Mr. Guttman has represented certain corporate clients at or above prevailing market rates; consequently, it cannot be said that his " 'custom' of charging rates below the market" derives simply from an inability to "command" higher rates. *See Covington*, 57 F.3d at 1108.[16] Accordingly, the Court concludes that, with respect to Mr. Guttman, Plaintiffs are entitled to an award of fees at the applicable *Laffey* rate ($340/hour).[17]

■ However, with respect to Plaintiffs' *other* attorneys, the Court finds that Plaintiffs have failed to make a sufficient showing that those attorneys should be compensated at the applicable *Laffey* rates. Defendant expressly requested information about these other attorneys, so that it would be in a position to evaluate their entitlement to *Laffey* rates. *See* Def.'s Opp'n at 28–29. Plaintiffs failed to comply with this request.[18] Accordingly, Plaintiffs have failed to demonstrate that these attorneys are entitled to compensation at *Laffey* rates. *Id.* at 1108 & n. 16 (citing *Blum v. Stenson*, 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

As Defendant has offered what the Court determines is a reasonable method of compensating these attorneys, and Plaintiffs have not suggested an alternative, the Court will accept Defendant's proposal; Plaintiffs' counsel Reuben A. Guttman shall be paid at $170/hour, Traci L. Buschner and Brian P. McCaffrey shall be

16. Plaintiffs have also offered sufficient evidence of Mr. Guttman's "experience, skill, reputation, and the complexity of" the present case, and Defendant has not attempted to refute this evidence. *See Covington*, 57 F.3d at 1108. Moreover, the Court is well aware from this litigation that Mr. Guttman more than satisfies these criteria.

17. Defendant argues that compensating Mr. Guttman at the *Laffey* rate of $340/hour would—assuming that he bills 1,800 hours in a typical year—give him a hypothetical salary of $612,000, which Defendant sees as excessive. Def.'s Opp'n at 27 & nn. 6–7. However, Defendant's hypothetical simply ignores the realities of how attorneys bill clients and generate income. *See* Pls.' Reply at 23; Supp. Decl. of Dan Guttman ¶ 7.

18. Plaintiffs were served with an interrogatory requesting certain information for "Dan Guttman, Reuben Guttman, and for any other attorney for whose work plaintiffs intend to seek an award of attorney's fees in this action." Def.'s Opp'n, Ex. R. Plaintiffs responded by providing Dan Guttman's information, but indicated that they would not be providing similar information regarding the other attorneys, unless Defendant subsequently requested such information. *Id.*, Ex. S. Shortly before Plaintiffs filed the present motion, Defendant again requested that its interrogatory "be answered for 'Reuben Guttman, and for any other attorney for whose work plaintiffs intend to seek an award of attorney's fees in this action.' " *Id.*, Ex. T. Again, Plaintiffs did not comply. In Defendant's Opposition, Defendant expressly pointed out Plaintiffs' failure to provide the requested information. Def.'s Opp'n at 28–29. However, in Plaintiff's Reply, Plaintiffs still did not provide the information or attempt to refute Defendant's characterization of Plaintiffs' non-compliance. Given this chronology, the Court concludes that it is fair and reasonable to reduce the fees requested for attorneys other than Dan Guttman.

paid at $115/hour, and Charlie V. Firth shall be paid at $90/hour. *See* Def.' Opp'n at 29 n. 8.

**D. Whether Certain of Plaintiffs' Costs Should Be Disallowed**

Defendant argues that the following requests for compensation should be disallowed: 31.5 hours for time devoted to Plaintiffs' unsuccessful motion for a temporary restraining order ("TRO"), 4.5 hours for time spent on a motion to compel that was not served, and 1.75 hours for an "SEC FOIA filing." Def.'s Opp'n at 23. In addition, Defendant challenges 39.8 hours of attorney time which it alleges are not properly documented in the accompanying billing records. *Id.* at 23.

Plaintiffs do not offer any response to these challenges, except to argue that although the motion for a TRO was denied, the 31.5 hours spent on it should be compensated because the motion was important to Plaintiffs' ultimate success in obtaining the released documents. Pls.' Reply at 21 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

In *Hensley,* the United States Supreme Court stated that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," which normally encompasses "all hours reasonably expended on the litigation," even if the plaintiff "failed to prevail on every contention raised in the lawsuit." 461 U.S. at 435, 103 S.Ct. 1933. However, Plaintiffs' TRO was not so much a failed "contention" as a failed "proceeding." Plaintiffs have not shown how their motion for a TRO made their ultimate success any more likely. Accordingly, Plaintiffs' request for fees relating to the TRO hours will be denied. In addition, Plaintiffs are also not entitled to compensation for the other improperly documented 39.8 hours.

Defendant next challenges Plaintiffs' request for $3,096 in litigation costs. Def.'s Opp'n at 31. The actual total of Plaintiffs' itemized expenditures is only $2,007.98. *See* Decl. of Dan Guttman, attach. 2. Since Plaintiffs have not offered any explanation or documentation as to why they seek an *additional* $1,088.02 in costs, this additional amount will not be considered by the Court. Further, it would appear that in itemizing the $2,007.98 in costs, Plaintiffs have included "labor costs," "costs of equipment," and "costs of space and electricity to house and maintain the equipment." Def.'s Opp'n at 31, Ex. V at 3. Such costs are not compensable. *See In re Mullins,* 84 F.3d 459, 469 (D.C.Cir.1996). Accordingly, the Court will reduce Plaintiffs' itemized expenses by approximately one-half, from $2,007.98 to $1,000.

In addition, Defendant argues that two-thirds of Mr. Guttman's time entries are listed in whole numbers, which according to Defendant suggests that Mr. Guttman "did not keep a careful and contemporaneous record of the time that he spent in this case ..." Def.'s Opp'n at 24. The Court disagrees. Defendant does not elaborate on why the practice of using whole numbers, in itself, would suggest the inappropriate or inaccurate billing of hours. Plaintiffs have produced an affidavit in which Mr. Guttman states that he "did, and routinely does, record his hours on the day on which they are incurred." Pls.' Reply at 21–22; Supp. Decl. of Dan Guttman ¶ 2. The Court credits Plaintiffs' statements, and notes that Defendant has not pointed to additional entries that seem

excessive or unwarranted. Nor does the total number of hours billed seem excessive or unwarranted. Accordingly, the Court finds that Plaintiffs are entitled to full compensation for Dan Guttman's recorded hours—except to the extent that certain specific hours have already been disallowed. *See Hensley,* 461 U.S. at 433, 103 S.Ct. 1933.

Finally, Defendant generally challenges the reasonableness of Plaintiffs' fees and costs; it contends that they are excessive, given that they substantially exceed the median fees award in recent FOIA cases in this Court ($16,575), and that "so little in the way of actual litigation has taken place" in Plaintiffs' two lawsuits. Def.'s Opp'n at 30–31 (citing Ex. U at 1–4).

The Court finds that the total amount of fees and costs to be awarded-which will exceed $100,000—is not unreasonable. As explained more fully in .Sections II.A.1 & 3, the lawsuits brought by Plaintiffs were hardly run-of-the-mill FOIA or Government in the Sunshine cases. On the contrary, Plaintiffs' lawsuits constitute complex litigation which succeeded in obtaining the release of vital information concerning what has been referred to as the most significant privatization during the Clinton Administration. *See* Pls.' Mot. at 9, Ex. 1 (quoting *U.S. News & World Report* article). The released documents led to numerous news articles and Congressional hearings, in which USEC's privatization was debated, critiqued and studied by lawmakers, academics, and members of the public. Given the nature of the lawsuits, and the vitally important public benefits that resulted therefrom, Plaintiffs' request for fees is well within the range of reasonableness, and the Court will not reduce Plaintiffs' compensation further than it already has.

## III. Conclusion

For the reasons stated, Plaintiffs' Motion for Fees and Expenses [# 28] is granted in part and denied in part. In accordance with the rulings contained in this Opinion, the parties shall, within 15 days of the entry of this Order, submit a proposed order which calculates the exact amount of fees and costs to be awarded.

An Order will issue with this Opinion.

## *ORDER*

This matter is before the Court on Defendant's Motion for Fees and Expenses [# 28]. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, for the reasons stated in the accompanying Memorandum Opinion, it is this—day of March 2001

**ORDERED**, that Defendant's Motion for Fees and Expenses [# 28] is **granted in part** and **denied in part**; and it is further

**ORDERED,** that based on the rulings contained in the accompanying Memorandum Opinion, the parties shall, within 15 days of the entry of this Order, submit a proposed order which calculates the exact amount of fees and costs to be awarded.