**In re USEC SECURITIES LITIGATION**

**No. CIV.H–01–1858.**

United States District Court, D. Maryland.

March 25, 2002.

Paul D. Young and Milberg Weiss Bershad Hynes & Lerach, LLP; New York City and Barbara Podell and Berger and Montague, P.C., Philadelphia, PA and Charles J. Piven, Baltimore, MD, for plaintiffs.

Richard L. Brusca, Andy G. Rickman and Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, for defendants USEC, Inc., William H. Timbers, Jr. and Henry Z. Shelton, Jr.

Daniel Slifkin, James Canning and Cravath, Swaine & Moore, New York City and Andrew H. Marks, Bridget E. Calhoun and Crowell & Moring, LLP, Washington, DC, for defendants Morgan Stanley Dean Witter & Co., Merrill Lynch & Co.,Inc., Janney Montgomery Scott LLC, Lehman Brothers Inc., Prudential Securities, Inc., Salomon Smith Barney Inc. and M.R. Beal & Co.

HARVEY, Senior District Judge.

This is a securities class action which has been brought on behalf of shareholders who purchased common stock of USEC, Inc. ("USEC") between July 23, 1998 and December 2, 1999 (the "Class Period"). Besides USEC, the consolidated amended class action complaint (the "amended complaint") names as defendants two individuals [1] (the "individual defendants") and seven lead underwriters (the "underwriter defendants") of USEC's initial public offering ("IPO").[2] Claims have been asserted under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"). 15 U.S.C. §§ 77k, 77l (a)(2) and 77o. Jurisdiction exists under 28 U.S.C. §§ 1331 and 1337.

Presently pending before the Court are two separate motions to dismiss the amended complaint. One motion has been filed by defendant USEC and the individual defendants. The second motion has been filed by the underwriter defendants. Extensive memoranda and exhibits in support of and in opposition to the pending motions have been submitted by the parties, and a hearing on the motions has been held in open court.

 In their submissions, the parties have relied on facts established by documents which are not a part of the amended complaint. The Court will nevertheless treat the pending motions as motions to dismiss rather than as motions for summary judgment. In ruling on a motion to

---

1. The individual defendants are William H. Timbers, Jr. (President and Chief Executive Officer of USEC) and Henry Z. Shelton, Jr. (Vice President and Chief Financial Officer of USEC).

2. The underwriter defendants include Morgan Stanley Dean Witter & Co., Merril Lynch & Co., Inc., Janney Montgomery Scott Inc., Lehman Brothers, Prudential Securities, Inc., Salomon Smith Barney and M.R. Beal and Co.

dismiss a securities fraud complaint, the Court is entitled to rely on public documents quoted by, relied upon, incorporated by reference in or otherwise integral to the complaint, and such reliance does not convert such a motion into one for summary judgment. *In re E.Spire Communications, Inc. Sec. Litig.,* 127 F.Supp.2d 734, 737 (D.Md.2001). Reliance on documents of this sort is particularly appropriate where, as here, the parties do not challenge the authenticity of the documents. *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 618 (4th Cir.1999).

# I

## *Procedural History*

On October 27, 2000, plaintiff Paul Spirgel filed the first of these ten securities class actions in the United States District Court for the Western District of Kentucky, Paducah Division. On June 14, 2001, defendants' motion to transfer venue of the ten cases to the District of Maryland pursuant to 28 U.S.C. § 1404(a) was granted, and the ten cases were thereafter docketed in this Court.[3] Following a status conference with counsel, this Court entered an Order on August 10, 2001 consolidating the ten pending class actions for all purposes pursuant to Rule 42(a), F.R.Civ.P..

In its Memorandum Opinion of October 22, 2001, the Court ruled on a motion filed by class members for the appointment of lead plaintiffs and for the approval of their selection of lead counsel and also on two motions to strike class allegations filed by the defendants. *In re USEC Sec. Litig.,* 168 F.Supp.2d 560 (D.Md.2001). For the reasons stated in its Opinion, the Court granted the motion of class members Harold Cohen and Myles Wren for appointment as lead plaintiffs and approved their selection of lead and liaison counsel. The Court also denied defendants' motion to strike class allegations. *Id.* at 569. Pursuant to the Court's Order of October 22, 2001, a consolidated amended class action complaint was thereafter filed.

Count I of this amended complaint asserts a claim against all defendants under § 11 of the Securities Act. Count II seeks a recovery against the underwriter defendants for alleged violations of § 12(a)(2) of the Securities Act. Count III asserts a claim against the individual defendants under § 15 of the Securities Act.

# II

## *Background Facts*

Defendant USEC is a Delaware corporation which maintains its principal executive offices in Bethesda, Maryland. Prior to 1998, USEC was a wholly-owned government corporation which had been created in 1992. Its principal business was to provide uranium enrichment services to utility companies which used nuclear reactors to produce electricity. USEC produced enriched uranium at two gaseous diffusion plants ("GDPs")[4] owned by the United States Department of Energy ("DOE").

In 1992, USEC was appointed executive agent for an agreement between the Unit-

---

**3.** In addition to *Spirgel, et al. v. USEC, Inc., et al.,* Civil No. H–01–1858, the other nine class actions transferred to this Court are as follows: *Steinberg, et al. v. USEC, Inc.,* Civil No. H–01–1859; *Sheremet v. USEC, Inc.,* Civil No. H–01–1868; *Brody v. USEC, Inc.,* Civil No. H–01–1869; *Lockwood v. USEC, Inc.,* Civil No. H–01–1870; *Schmookler v. USEC, Inc.,* Civil No. H–01–1871; *Solomon v. USEC, Inc.,* Civil No. H–01–1872; *Spina v. USEC, Inc.,* Civil No. H–01–1873; *Grimm v. USEC, Inc.,* Civil No. H–01–1874; and *Sklar v. USEC, Inc.,* Civil No. H–01–1875.

**4.** USEC operated two GDPs, one located in Paducah, Kentucky and the other located in Portsmouth, Ohio.

ed States and Russia. This agreement required USEC to buy from Russia at fixed prices uranium extracted from dismantled nuclear weapons. Under the agreement, Russia was required to dilute weapons grade highly enriched uranium ("HEU") to low enriched uranium and to sell the product to USEC which would in turn sell to nuclear power plants.

In April, 1996, Congress enacted the USEC Privatization Act, 42 U.S.C. § 2297h, the purpose of which was to transfer the federal government's interest in USEC to the private sector. The Act authorized the Board of Directors of USEC to privatize the corporation either through an IPO or by having a private corporation acquire it. Meetings of the Board were held in June of 1998 resulting in the Board's decision to adopt the IPO option.

On June 29, 1998, USEC filed with the Securities and Exchange Commission (the "SEC") a registration statement and prospectus which became effective on July 23, 1998. Pursuant to the registration statement and the prospectus, 100 million shares of USEC's common stock were sold at a price of $14.25 per share, raising approximately $1.4 billion.[5] The registration statement was signed by the individual defendants.

It is alleged in the amended complaint that the prospectus was materially false and misleading in that it misrepresented that USEC had a viable core business model, the cornerstone of which was the deployment of a new enrichment technology called atomic vapor laser isotope separation ("AVLIS"). At the time of the IPO, USEC was producing enriched uranium at its GDPs by the gaseous diffusion method. AVLIS was laser-based and assertedly would enable the company to reduce its production costs and profitably compete in the global enriched uranium business. Plaintiffs allege that at the time of the IPO, USEC had no reasonable prospect or intention of deploying AVLIS.

It is alleged that the prospectus issued in connection with the IPO was materially false and misleading in numerous respects. According to the amended complaint, the prospectus misrepresented (1) USEC's ability to profitably produce enriched uranium by falsely stating that the company was close to employing AVLIS as a new technology when in fact the viability of AVLIS was unproven and defendants intended to abandon it after the IPO; (2) the costs associated with AVLIS; (3) the impact which the HEU contract with Russia had on USEC's profitability; (4) USEC's plans related to sales of natural uranium; (5) the ability of USEC to profitably produce enriched uranium at the GDPs; (6) USEC's competitive position in the enriched uranium market; and (7) USEC's intention to continue to operate both of its GDPs.

On June 9, 1999, USEC announced that it was abandoning the proposed AVLIS technology. On October 26, 2000, USEC common stock closed at $4.5625 per share. The first of these securities cases was docketed in the United States District Court for the Western District of Kentucky on October 27, 2000.

## III

### Applicable Principles of Law

■ A motion to dismiss filed pursuant to Rule 12(b)(6), F.R.Civ.P. will not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering motions like those filed in

---

5. USEC's shares are listed and traded on the New York Stock Exchange.

this case, the Court will consider the facts stated in the complaint, as well as the documents referred to in the complaint and relied upon by plaintiff in bringing the action. *Recupito v. Prudential Sec., Inc.,* 112 F.Supp.2d 449, 453 (D.Md.2000). It is therefore appropriate for this Court in this case to consider the contents of the registration statement, including the prospectus and other public documents which the parties rely upon and the authenticity of which is not challenged. *Phillips,* 190 F.3d at 618; *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 623 n. 4 (E.D.Va.2000).

Section 11 of the Securities Act imposes liability if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, . . ." 15 U.S.C. § 77k(a). Similarly, § 12(a)(2) of the Securities Act imposes liability upon any person who "offers or sells a security...by means of a prospectus..., which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstance under which they were made, not misleading..." 15 U.S.C. § 77*l* (a)(2). Section 15 of the Securities Act imposes liability on controlling persons who are made liable jointly and severally with persons found liable under §§ 11 and 12(a)(2). 15 U.S.C. § 77o.

■ Under § 13 of the Securities Act, no action shall be maintained to enforce any liability created under §§ 11, 12(a)(2) and 15 "unless brought within one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reason and diligence..." 15 U.S.C. § 77m. Thus, the claims asserted here by the plaintiffs in Counts I, II and III under Sections 11, 12 and 15 of the Securities Act are governed by the statute of limitations contained in § 13. *See Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 349 (2d Cir.1993).

■ For a misrepresentation or omission to violate the Securities Act, it must be material. The question of materiality is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). A misrepresented or omitted fact is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder. *Id.* at 449, 96 S.Ct. 2126. Disclosure of the true facts or the omitted fact must have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.*

■ In *Gasner v. Board of Supervisors of the County of Dinwiddie, Va.,* 103 F.3d 351 (4th Cir.1996), the Fourth Circuit applied the so-called "bespeaks caution" doctrine. As there noted, cautionary language in an offering document may negate the materiality of an alleged misrepresentation or omission. *Id.* at 358.

## IV

### *Limitations*

Relying on § 13 of the Securities Act, all defendants first contend that the claims asserted by plaintiff in the amended complaint are barred by limitations. Pursuant to § 13, the claims asserted by plaintiffs in Counts I, II and III of the amended complaint under §§ 11, 12 and 15 of the Securities Act may not be maintained unless they were brought within one year after discovery of the untrue statements or omissions or after such discovery should

have been made by the exercise of reason and diligence.

■ Plaintiff Spirgel filed his complaint on October 27, 2000, and that was the first of the suits which have been consolidated herein. Relying on *Brumbaugh v. Princeton Partners*, 985 F.2d 157 (4th Cir.1993), defendants contend that plaintiffs were aware of their potential claims or were on inquiry notice of such claims well prior to October 27, 1999, and that all of their claims are therefore time barred. Discovery of facts constituting the alleged misrepresentations or omissions can be by actual notice, by constructive notice or by inquiry notice. *See Dodds*, 12 F.3d at 350.

(a)

*Actual or Constructive Notice*

It is apparent from a review of the prospectus that deployment of the AVLIS technology was the cornerstone of USEC's future profitability. Indeed, the amended complaint itself alleges that the new enrichment technology called AVLIS was the "cornerstone" of USEC's "viable core business model" and that the deployment of AVLIS "would enable the Company to reduce its production costs by 50% and profitably compete in the global enriched uranium business." ¶ 29. Only some eleven months after July 23, 1998, the effective date of the prospectus, USEC issued a press release announcing that AVLIS had been abandoned. The June 9, 1999 press release stated:

[W]e have reexamined the AVLIS technology, performance, prospects, risks and growing financial requirements as well as the economic impact of competitive marketplace dynamics. We now have enough data to conclude that the returns are not sufficient to outweigh the risks and ongoing capital expenditures necessary to develop and construct an AVLIS plant.

¶ 37(d).

■ Defendants contend that the announcement by USEC on June 9, 1999 that it was discontinuing what has been characterized by plaintiffs as the cornerstone of USEC's business constituted actual or constructive notice to plaintiffs of facts suggesting that the prospectus contained misrepresentations or omissions which were actionable under the Securities Act. This Court would agree.

■ The Fourth Circuit *Brumbaugh* decision is the leading case in this Circuit discussing the principles to be applied in a case in which the defendants are relying on § 13 in seeking dismissal of an action brought under the Securities Act. *Brumbaugh* involved the so-called "inquiry notice" standard. Pursuant to such a standard, when a prospectus sufficiently discloses the risks inherent in an investment, the investor is on inquiry notice of his claims, and the limitations period applicable to claims of misrepresentation in that prospectus begins to run from the date of the sale of the security. *Id.* at 163. The Court's discussion in *Brumbaugh* of the principles to be applied under an inquiry notice standard is also pertinent when, as here, actual or constructive notice is claimed.

In this case, prospects of USEC's future profitability which had been touted in the prospectus were materially and adversely affected by the June 9, 1999 press release announcing USEC's abandonment of AVLIS. In their amended complaint, plaintiffs allege that at a secret USEC board meeting held six weeks before the IPO, George Rifakes, its Executive Vice President for Operations stated: "And we cannot compete with the GDPs. We are going to have trouble competing with the GDPs." ¶ 29. However, at the same board meeting, Rifakes recognized the vital part that

the deployment of AVLIS played in the Company's future profitability. As shown by the transcript of the June 3, 1998 board meeting,[6] Rifakes stated that after a one-year study, "[W]e concluded that the best way to stay in the business was to build AVLIS and to build it *as quickly as possible,* because [of] the savings...and clearly, based on that analysis, AVLIS was the winner from strictly the business side, staying, maintaining a viable company, a competitive company." (Emphasis added). (Tr. at 202). As the prospectus pointed out at page 15, USEC's decision not to proceed with the deployment of AVLIS would require it to pursue other options for enrichment services "which could have a material adverse effect on the Company's financial or commercial position."

Once there was public notice of the abandonment of AVLIS only some eleven months after the prospectus date, plaintiffs failed to exercise due diligence in uncovering their claims.[7] The objective standard of due diligence recognized by *Brumbaugh* requires reasonable investigation of the possibility of misrepresentation once an individual has been placed on notice of wrongdoing. *Id.* at 162. At the very least, the press release should have triggered efforts on the part of investors to discover the untrue statements or omissions relied upon by plaintiffs in their amended complaint. Had public information been reviewed by investors during the four month period between June 9, 1999 and October 26, 1999, the exercise of reason and due diligence by plaintiffs would have revealed the existence of the alleged untrue statements and omissions, and the *Spirgel* complaint could have been filed at

an earlier date when it was not time barred.

Plaintiffs argue that there are disputed questions of fact concerning whether and when they should have discovered the existence of the misrepresentations by the exercise of due diligence and that a limitations issue like this one cannot be decided by way of a motion to dismiss. In *Brumbaugh,* the Fourth Circuit rejected that argument. Where, as here, the underlying facts are undisputed, the issue of whether a plaintiff has been put on notice can be decided as a matter of law. *Id.* at 162; *Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256, 1263 (4th Cir.1993). The relevant underlying facts have been established in this case by the amended complaint and the public documents relied upon by the parties. *Recupito,* 112 F.Supp.2d at 453; *MicroStrategy,* 115 F.Supp.2d at 623 n. 4. The authenticity of these documents has not been challenged by the parties. *See Phillips,* 190 F.3d at 618.

Plaintiffs further argue that they could not have discovered the existence of the misrepresentations until April 13, 2000, when evidence of fraud was presented at a Congressional oversight hearing. But notice is triggered by evidence of the "possibility" of untrue statements or omissions, and not by complete exposure of the wrongful conduct. *Brumbaugh,* 985 F.2d at 162 (citing *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 802 (1st Cir.1987)). As the Court noted in *Harner v. Prudential Secs., Inc.,* 785 F.Supp. 626, 632 (E.D.Mich.1992), *aff'd.* 1994 WL 494871, 35 F.3d 565 (6th Cir.1994),[8] a plaintiff need

---

**6.** As noted hereinafter in Part IV(b) of this Opinion, this transcript was publicly released on July 2, 1999 and was referred to in media reports shortly thereafter.

**7.** In ¶ 37 of the amended complaint, plaintiffs acknowledge that the June 9, 1999 press re-

lease was evidence of the fact that AVLIS technology was extremely speculative and would not be commercially viable.

**8.** *Harner* was cited with approval in the Fourth Circuit's *Brumbaugh* opinion. 985 F.2d at 163.

not have before him all the facts necessary to establish that a statement was untrue or omitted before the limitations period accrues. Once a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice. *Id.* Assuredly, the press release of June 9, 1999 was a "storm warning." *See Dodds,* 12 F.3d at 350. An applicable limitations period starts to run as soon as such a warning appears. *See Giant Group Ltd. v. Sands,* 142 F.Supp.2d 503, 507 (S.D.N.Y. 2001). A "storm warning" has been characterized as any indication in a communication issued subsequent to the prospectus "that could reasonably be considered contrary to the rosy predictions that the plaintiffs claim were misrepresentations." *Harner,* 785 F.Supp. at 634.

The "rosy predictions" in this prospectus were that AVLIS would soon be deployed and would enable USEC to be profitable and to compete successfully with its competitors. Since USEC's future success was substantially dependent on its ability to reduce production costs by the deployment of AVLIS, such deployment was a fundamental aspect of USEC's business prospects.[9] Less than eleven months after the prospectus was filed, this cornerstone of USEC's future profitability was abandoned, raising an indication that USEC and the individual defendants had falsely stated in the prospectus that commercial deployment of AVLIS was anticipated within several years (Prospectus, p. 6). With the announcement that AVLIS had been abandoned, the falsity of the statement in the prospectus that it would soon be deployed became apparent, and a cause of action under the Securities Act existed. At the very least, plaintiffs should have undertaken an investigation. As soon as

the plaintiffs "were apprised of the possibility of [the wrongs], they were under a duty to investigate any misrepresentations..." *Cooke,* 998 F.2d at 1263.

Section 11 of the Securities Act places a relatively minimal burden on a plaintiff. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). A stringent standard of liability is imposed by § 11 on the parties who play a direct role in the offering. *Id.* at 381–82, 103 S.Ct. 683. Liability is virtually absolute, even for negligent or innocent misstatements. *Id.* at 382, 384, 103 S.Ct. 683. There was no need for plaintiffs to wait until April 13, 2000 when evidence was presented at a Congressional hearing indicating that the prospectus may have contained fraudulent statements. Commencement of a limitations period need not await the dawn of complete awareness. *Brumbaugh,* 985 F.2d at 162. Long before the Congressional hearing, there had been a public announcement by USEC that the AVLIS technology would not be deployed. With its cornerstone removed, the entire structure of USEC's future profitability, described in detail in the prospectus, was in serious jeopardy.

As in *Kauthar SDN BHD v. Sternberg,* 149 F.3d 659, 671 (7th Cir.1998), plaintiffs' amended complaint in this case contains allegations of a "plethora" of misrepresentations and omissions. Since plaintiffs, less than eleven months after the IPO date had actual or constructive notice of a false or misleading statement in the prospectus (indeed one relating to the principal cornerstone of USEC's future profitability), they were on notice at the same time that the other statements in the prospectus relied upon were also false or misleading. *Id.; see also Eckstein v. Balcor Film In-*

---

9. As counsel for plaintiffs noted during oral argument, board members "based the entire prospectus, the whole pitch of this compa-

ny...on the viability of [AVLIS] technology." (Tr. at 40).

*vestors,* 58 F.3d 1162, 1168 (7th Cir.1995). Thus, on June 9, 1999, or on a reasonable date thereafter, plaintiffs were aware or should have been aware of sufficient facts to learn that a cause of action existed against defendants under the Securities Act more than one year before the first of the pending suits was filed.

For these reasons, this Court concludes that, as a result of the issuance by USEC of its press release on June 9, 1999, plaintiffs had actual or constructive notice of viable claims against defendants more than one year before October 27, 2000. Pursuant to § 13 of the Securities Act, the claims asserted by plaintiffs in the amended complaint are therefore barred by limitations.

#### (b)

#### *Inquiry Notice*

▉▉▉ In the alternative, defendants argue that under *Brumbaugh,* inquiry notice also existed here and that the one year limitations period of § 13 began to run from the date of sale of the securities on plaintiffs' claims that there were misrepresentations and omissions in the prospectus. On the record here, this Court concludes that the doctrine of inquiry notice does indeed apply in this case and that plaintiffs' claims are in the alternative barred under the inquiry notice principles enunciated by the Fourth Circuit in *Brumbaugh.*

▉▉▉▉ As set forth in some detail in Part VI of this Opinion (pp. 25–28), the prospectus at issue here contains numerous explicit cautionary warnings of the risks faced by a prospective investor. The objective standard of due diligence "requires reasonable investigation of the possibility of misrepresentation" once an individual has been placed on inquiry notice of wrongdoing. *Brumbaugh,* 985 F.2d at 162. As in *Brumbaugh,* the prospectus here contains a host of warnings making it plain that investors would be purchasing a speculative investment. Inquiry notice is triggered by evidence "of the possibility" of a claim of misrepresentation and not by complete exposure of the alleged scam. *Id.* Once a plaintiff is on inquiry of an alleged misstatement or omission, "a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such inquiry." *Dodds,* 12 F.3d at 350.

In *Brumbaugh,* the Court held that when a prospectus officially discloses the risks inherent in an investment, the investor is on inquiry notice of his claims and the limitations period begins to run from the date of sale on claims arising as a result of statements in the prospectus. *Id.* at 163. In support of that holding, the following cases were cited: "*Kennedy,* 814 F.2d at 803; *Goldstandt v. Bear, Stearns & Co.,* 522 F.2d 1265, 1269 (7th Cir.1975); *Harner v. Prudential Sec. Inc.,* 785 F.Supp. 626, 634–39 (E.D.Mich.1992); *Landy v. Mitchell Petroleum Technology Corp.,* 734 F.Supp. 608, 616–18 (S.D.N.Y. 1990); *Bender v. Rocky Mountain Drilling Assocs.,* 648 F.Supp. 330, 334–35 (D.D.C.1986)." *Id.*

In arguing that their claims are not barred by limitations, plaintiffs place heavy reliance on certain information contained in transcripts of Federal USEC board meetings which were held shortly prior to the IPO and which, according to plaintiffs, were first made public on April 13, 2000. On that date, an investigative hearing into operations of USEC was held by a Subcommittee of the Commerce Committee of the House of Representatives. According to plaintiffs, evidence produced at the April 13, 2000 Congressional hearing, including the testimony of witnesses and excerpts from transcripts of meetings of the USEC board held in June and July of 1998, revealed publicly for the first time that there were misrepresentations and omissions in the prospectus. Plaintiffs maintain that, pursuant to § 13 of the

Securities Act, the *Spirgel* action was timely filed some six months after the April 13, 2000 date.

In contending that the misrepresentations and omissions contained in the prospectus were not discovered by them until the April 13, 2000 Congressional hearing, plaintiffs in particular rely on certain comments made by District Judge Kessler in her opinion in *Oil, Chemical & Atomic Workers v. United States Dep't of Energy,* 141 F.Supp.2d 1 (D.D.C.2001) (*"OCAW"*). The *OCAW* suit was brought under the Freedom of Information Act and the Government in Sunshine Act by the union for workers at the two GDPs operated by USEC. In the *OCAW* case, the union sought an order requiring the United States Department of Energy ("DOE") to produce certain records relating to the privatization of USEC. The case was settled when defendant DOE agreed to publicly release certain documents. Judge Kessler's opinion merely ruled on plaintiffs' motion for an award of fees and costs.

A review of Judge Kessler's opinion in *OCAW* discloses that it in fact supports defendants' contention that plaintiffs here did not undertake a reasonable investigation of the possibility of misrepresentation after they had been placed on inquiry notice of wrongdoing. According to Judge Kessler, the plaintiffs in *OCAW* forced *"the public release* of countless important documents relating to the privatization of USEC, including . . . . the minutes and transcripts of the June–July 1998 USEC meetings which had been closed to the public . . . and studies of a certain type of technology (referred to as 'AVLIS') which Plaintiffs allege was projected to be the cornerstone to USEC's commercial profitability." (Emphasis added) 141 F.Supp.2d

at 5. The date when these documents were released to the public was July 2, 1999. As noted by Judge Kessler, the documents obtained by the plaintiffs in the case were "widely disseminated to the media and the public. . ." *Id.* at 6. "The transcripts of the June–July 1998 meetings. . .were disclosed to the public only because of Plaintiffs' lawsuits. . ." *Id.*

Plaintiffs' contention that the transcripts of the June 3, 1998 board meeting were not placed in the public domain on July 2, 1999 is belied by Judge Kessler's opinion. Moreover, *Fresh FUEL,* an industry publication, reported on July 26, 1999 that transcripts "covering board deliberations beginning in June 1998 and leading up to the July 23 IPO, were obtained by the [union]. . .through a Freedom of Information Act request." According to this article, the "transcript of USEC board meetings. . .show a harried and testy board of directors rushing toward privatization at the urging of advisors concerned about the negative effects on the financial markets of any delay or dissension." (Ex. 3, USEC defendants' reply memorandum).

In its July 16, 1999 issue, *Nuclear Fuel,* a McGraw–Hill, Inc. industry publication, also referred to and quoted from the transcripts of the board meetings held in June and July of 1998. According to this article, "Details of [the July 22, 1998] board meeting and several others on privatization were released this month as a result of a lawsuit filed July 14, 1998 under the Government in the Sunshine Act by the union that represents workers at USEC's two gaseous diffusion plants. . . ." [10] (Ex. 2, USEC defendants' reply memorandum).

It is thus apparent that the information which plaintiffs claim was not known until

10. An article appearing in *The Columbus Dispatch* on August 1, 1999 also quoted from transcripts of the board meetings in question and referred to "previously confidential documents that showed some members of the board that set up the private corporation had serious misgivings about that decision."

April 3, 2000 had been publicly revealed in July of 1999. Information that may constitute inquiry notice includes any financial, legal or other data, including public disclosures in the media, about the financial condition of the corporation. *Giant Group, Ltd.*, 142 F.Supp.2d at 507 (quoting *Dietrich v. Bauer*, 76 F.Supp.2d 312, 343 (S.D.N.Y.1999)). Had plaintiffs undertaken a reasonable investigation of information publicly available in the media in July of 1999, they would have been alerted to the possibility (even the probability) that there were misleading statements or significant omissions in the prospectus well in advance of October of 1999.

When the prospectus at issue here is read in its entirety, it is apparent that it contains numerous explicit warnings of the potential risk of an investment in USEC's stock. Thus, this Court alternatively concludes that plaintiffs were placed on inquiry notice of wrongdoing on July 23, 1998, when the final registration statement and prospectus was filed. Had they undertaken a reasonable investigation of information in the media, plaintiffs would have been in possession of sufficient facts to have enabled them to file suit well before October 27, 1999. Since plaintiff Spirgel's complaint was not filed until October 27, 2000, the claims asserted in the amended complaint are barred by § 13 of the Securities Act. Where, as here, the pleadings and public documents demonstrate that plaintiffs were on inquiry notice more than a year before the complaint was filed, a court may appropriately grant a motion to dismiss. *Giant Group, Ltd.*, 142 F.Supp.2d at 507–08 (S.D.N.Y.2001).

## V

### *Predictive Statements and Puffery*

■ The amended complaint is 37 pages in length and contains 75 paragraphs. It sets forth a laundry list of alleged misrepresentations and omissions in the prospectus, including, *inter alia*, the following:

(1) That the Company expects its project development costs for fiscal 1998 to continue at about the same rate of spending as during the nine months ended March 31, 1998 and that AVLIS deployment is estimated to cost approximately $2.2 billion from fiscal 1998 to fiscal 2005 (¶ 39);

(2) That the Company anticipates that a trend toward somewhat lower prices for SWUs [11] will continue (¶ 43(h));

(3) That USEC plans to sell natural uranium gradually, intends to manage its sales of natural uranium so as to not significantly affect the U.S. natural uranium market and does not anticipate making significant natural uranium sales until after fiscal 2000 (¶ 44);

(4) That USEC was upgrading its GDP facilities, and planned capital and major maintenance expenditures which were expected to be sufficient to maintain the operability of the plants at least through 2005 (¶ 46);

(5) That USEC is the world leader in the production and sale of uranium fuel enrichment services (¶ 48); and

(6) That USEC has entered into an agreement with the U.S. Treasury to operate two GDPs until January 1, 2005 (¶¶ 50–51).

Relying on *Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir.1993), defendants contend that these statements contained in the prospectus are not actionable because they are merely predictive expressions of optimism or puffery. In *Raab*, the Fourth Circuit explained why such predictive statements are not actionable, as follows (*Id.* at 290):

11. Enriched uranium is measured in units called Separative Work Units ("SWUs").

Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen. The market gives the most credence to those predictions supported by specific statements of fact, and those statements are, of course, actionable if false or misleading. However, projections of future performance not worded as guarantees are generally not actionable under the federal securities laws.

This Court concludes that the statements listed herein may not be relied upon by plaintiffs in seeking relief under the Securities Act, the language used ("expects"..."anticipates"..."plans"... "expected to be") is predictive and is not worded as guarantees of future performance. Moreover, soft expressions of optimism which are analogous to "puffing" have been held not to constitute actionable misrepresentations. *In re Manugistics Group, Inc.,* 1999 WL 1209509 at *2 (D.Md.1999).

■■■ In *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 212 (4th Cir.1994), the Court held that statements indicating that the company was "on target toward achieving the most profitable year in its history" were predictions as to future events and constituted the type of vague predictions of growth held in *Raab* to be immaterial as a matter of law in a securities fraud case. Predictive statements are much less likely to be actionable under the securities laws because a reasonable investor knows of the risks and uncertainties involved in predicting the future. *Krim v. Coastal Physician Group, Inc.,* 81 F.Supp.2d 621, 627 (M.D.N.C.1998).

■■■ Moreover, the statement in the prospectus that USEC is the "world leader" in the uranium enrichment industry is mere puffery. A soft puffing statement of this sort lacks materiality because the market price of a share is not inflated by

such a vague statement. *Raab,* 4 F.3d at 289. In *Longman v. Food Lion, Inc.,* 197 F.3d 675 (4th Cir.1999), stockholders brought securities fraud class actions against a corporation which operated grocery stores. In public statements, the defendant had claimed, *inter alia,* that it provided its employees with "some of the best benefits in the supermarket industry" and that "Food Lion is one of the best-managed high growth operators in the food retailing industry." *Id.* at 684. Although not material to its holding in the case, the Fourth Circuit (citing *Raab* ), found these statements to be "immaterial puffery that is not actionable under the Securities Act." *Id.* at 684, n. 2.

For these reasons, this Court concludes that the statements listed hereinabove are not actionable under the Securities Act and may not be relied upon by plaintiffs in this case.

## VI

### *The Bespeaks Caution Doctrine*

■■■ In *Gasner,* the Fourth Circuit considered whether the statements relied upon by the plaintiffs in that case in asserting claims under § 10(b) of the Securities Exchange Act were objectively reasonable. Pursuant to the Supreme Court's decision in *TSC Industries,* the alleged misrepresentations and omissions relied upon by a plaintiff in a securities case must be considered in the full context in which they were made. *Gasner,* 103 F.3d at 358. The "total mix" of available information contained in a prospectus cannot be disregarded. *Id.* Cautionary language in the prospectus may negate the materiality of an alleged misrepresentation or omission. *Id.; In re Donald J. Trump Casino Sec. Lit.,* 7 F.3d 357, 371 (3d Cir.1993), *cert. denied sub nom Gollomp v. Trump,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Under the so-called "bespeaks

caution" doctrine, claims of securities fraud are therefore subject to dismissal if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions. *Gasner*, 103 F.3d at 358.

The prospectus [12] at issue in this case is 93 pages in length, and 22 pages of exhibits are attached. Pages 12, 13 and 14 discuss "RISK FACTORS." [13] The prospectus is replete with cautionary language, including the following:

> An investment in the Common Stock involves certain risks associated with the Company's business, including... (vi) risks related to Atomic Vapor Laser Isotope Separation ('AVLIS'). (Pr. at 5–6). There are a number of risks associated with the development and commercialization of AVLIS, ... and any of these could have a material adverse effect on the Company's financial or competitive position. (Pr. at 15).
>
> Additional equipment demonstration and testing activities [for AVLIS] are necessary before the Company will be in a position to finalize its decision to construct a full-scale commercial facility. (Pr. at 15).
>
> If the Company determines not to proceed with AVLIS deployment, the Company would pursue other options....which could have a material adverse effect on the Company's financial or competitive position. (Pr. at 15). The Company could incur certain additional costs in connection with terminating the AVLIS project. (Pr. at 15). In the event that the Company determines to deploy AVLIS, no assurance can be given that an AVLIS plant could

be completed as scheduled or that a full-scale facility will operate at its design capacity. (Pr. at 15).

> USEC has potential liability under certain agreements if it determines not to deploy AVLIS.... (Pr. at 66).
>
> The GDPs are approximately 45 years old and planned capital and major maintenance expenditures of approximately $15 to $35 million each year are expected to be sufficient to maintain the operability of the plants at least through 2005. (Pr. at 60)
>
> There can be no assurance that the commitment to continue operations at both GDPs will not adversely affect the Company's financial performance if the supply of SWU increases or the demand for SWU decreases. (Pr. at 12)
>
> Freon is currently used as the primary process coolant but production of freon in the United States has been terminated. The company believes that its efforts to reduce freon losses and its inventory of freon should be adequate to allow the GDPs to operate with freon through 2001. A program is under way to identify and validate an alternative coolant to be used once the freon inventory is depleted. (Pr. at 60).
>
> Unit costs of SWU purchased under the Russian HEU Contract are substantially higher than the Company's marginal cost of production. (Pr. at 38).
>
> The Company will require significant financing to achieve commercial deployment of AVLIS. There can be no assurance that financing will be available when required.... (Pr. at 15)

---

**12.** References to the prospectus are hereinafter designated "Pr."

**13.** Subheadings under the "RISK FACTORS" portion of the prospectus include: "Risks Associated with Enrichment Operations." "Re-

liance on Nuclear Utility Industry"; "Customer Concentration;" "Competition; Currency Exchange Rates, Trend Toward Lower Pricing;" "Risks Associated with Purchases Under the Russian HEU Contract;" and "Electricity." (Pr. at 12, 13 and 14).

If the Company determines to deploy AVLIS, there can be no assurance that development costs or construction costs associated with AVLIS would not be higher than anticipated. (Pr. at 15).

The Company is aware of patents issued to third parties which cover certain technology used in laser-based products; the Company...may be required to obtain a license to one or more of such patents. There can be no assurance that...the Company would be able to obtain necessary licenses to certain technology. (Pr. at 15).

The Company periodically re-evaluates its AVLIS estimated costs and currently believes this estimate could vary by up to 20%. (Pr. at 43).

An investment in the common stock involves certain risks associated with the company's business, including risks associated with the contract between USEC and Techsnabexport Co., Ltd., a Russian government entity ("Tenex") dated January 14, 1994 (the "Russian HEU Contract"). (Pr. at 5–6).

The Company anticipates that a trend toward somewhat lower prices will continue as the Company competes for new business. There can be no assurance that the Company's financial performance will not be adversely affected by that trend. (Pr. at 13).

The Company's cost of sales has been, and will continue to be, adversely affected by amounts paid to purchase SWU under the Russian HEU Contract at prices which are substantially higher than its marginal production cost at the GDPs. In addition, as the volume of Russian SWU purchases has increased, the Company has operated the GDPs at lower production levels resulting in higher unit production costs. (Pr. at 8, 32 and 37).

Overcapacity, coupled with sales of buyer-held inventory, and exports of en-riched uranium from the countries [of] the former Soviet Union over the last several years have resulted in significant downward pressure on prices.... There can be no assurance that the Company's financial performance will not be adversely affected by that trend. (Pr. at 13).

The mechanism for establishing prices for SWU purchases under the Russian HEU Contract through 2001 has been set, and the prices are expected to be substantially higher than the Company's marginal cost of producing SWU at the GDPs. Consequently, although the Company presently can resell the Russian SWU for more than it is paying for the SWU, such sales are less profitable than sales of SWU produced at the GDPs. The effect of this pricing structure will become more pronounced if market prices for SWU decline further, and there can be no assurance that the price the Company pays for the Russian SWU will not exceed the price at which it can resell the material. (Pr. at 14).

There can be no assurance that an active trading market will develop or be sustained after the Offering, or that purchasers of Shares will be able to resell their Shares at prices equal to or greater than the offering price and [therefore] the market price of the Shares may be highly volatile. (Pr. at 18).

Many of the warnings contained in the prospectus are referred to in the amended complaint, as follows:

AVLIS deployment is estimated to cost approximately $2.2 billion from fiscal 1998 through fiscal 2005.... (¶ 39).

Although acting as U.S. Executive Agent may pose certain risks, the arrangement provides an important strategic opportunity for USEC to introduce additional uranium enrichment services

from Russia to the global market... (¶ 42).

The Company's cost of sales has been, and will continue to be, adversely affected by amounts paid to purchase SWU under the Russian HEU Contract at prices which are substantially higher than its marginal production cost at the GDPs. (¶ 42).

The mechanism for establishing prices for SWU purchases under the Russian HEU Contract through 2001 has been set, and the prices are expected to be substantially higher than the Company's marginal cost of producing SWU at the GDPs. (¶ 42).

Although revenue increased in fiscal 1997, gross profit was adversely affected by higher unit production costs at the GDPs caused mainly by unplanned equipment downtime and increased preventive maintenance activities and increased purchases of SWU under the Russian HEU Contract. Gross profit in fiscal years 1997 and 1996 was also adversely affected by declines in average prices billed to customers. (¶ 42).

Overcapacity, coupled with sales of buyer-held inventory, and exports of enriched uranium from the countries comprising the former Soviet Union over the last several years have resulted in significant downward pressure on prices... and the Company anticipates that a trend towards somewhat lower prices will continue as the Company competes for new business. (¶ 42).

 This Court concludes that the extensive cautionary language set forth hereinabove rendered immaterial as a matter of law the alleged misrepresentations and omissions relied upon by plaintiffs in this case. The disclaimers contained in the prospectus were neither vague nor "boilerplate" in nature. Rather, the prospectus at issue here contained "detailed and meaningful cautionary language tailored to the specific risks" which USEC faced. *Recupito,* 112 F.Supp.2d at 455; *Gasner,* 103 F.3d at 359; *In re Donald J. Trump,* 7 F.3d at 371–72. Here, as in *Trump* and *Gasner,* the cautionary statements were tailored precisely to address the uncertainties faced by USEC in its future operations.

Insofar as the deployment of AVLIS was concerned, investors were told in the prospectus that risks associated with its development and commercialization could have a material adverse effect on the company's financial or competitive position and that if USEC decided not to proceed with AVLIS, it would pursue other options and incur additional costs in connection with terminating the AVLIS project. It was also indicated in the prospectus that USEC had potential liability under certain agreements if it determined not to deploy AVLIS and that there was no assurance that significant financing would be available which would be required to achieve commercial deployment of AVLIS. Risks associated with the Russian HEU contract were also described. Investors were told that unit costs of SWU purchased under the Russian HEU contract were substantially higher than the company's marginal cost of production. It was also indicated in the prospectus that the mechanism for establishing prices for SWU purchases under the Russian HEU contract had been set only through 2001. There was cautionary language stating that, as the volume of Russian SWU purchases had increased, USEC had operated its GDPs at lower production levels, resulting in higher unit production costs.

Investors were further told that overcapacity coupled with sales of buyer-held inventory and exports of enriched uranium from other countries of the former Soviet Union had resulted in significant downward pressure on prices. It was stated

that there could be no assurance that USEC's financial performance would not be adversely affected by that trend. Shareholders were further told that there could be no assurance that an active trading market for USEC's shares would develop and would be sustained after the offering, and that the market price for USEC's shares might be highly volatile.

 In this case, there is not a substantial likelihood that the disclosure of the alleged actual or omitted facts would have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available. *TSC Indus., Inc.*, 426 U.S. at 438, 96 S.Ct. 2126. Had a reasonable shareholder read the prospectus in its entirety, including the extensive cautionary language contained therein, the alleged untrue facts and the alleged omitted facts would not have assumed actual significance in the shareholders' deliberations. *Id.* Although the "total mix" of the information made available warned plaintiffs of the high risks which they were facing, they nonetheless chose to purchase common stock of USEC.[14] Where, as here, reasonable minds cannot differ on the question of materiality, "the court may rule them immaterial as a matter of law." *Recupito*, 112 F.Supp.2d at 454 (quoting *Klein v. General Nutrition Cos.*, 186 F.3d 338, 342 (3d Cir.1999)). On the record here, this Court concludes that cautionary language in the prospectus negates as a matter of law the materiality of the misrepresentations and omissions alleged in the amended complaint.

Accordingly, even if plaintiffs' claims were not barred by limitations, defendants' motions to dismiss must be granted on the ground that the "bespeaks caution" doctrine applies to the circumstances in this case.[15]

## VII

### *Other Arguments of Defendants*

In further support of their motion to dismiss, USEC and the individual defendants argue that plaintiffs have failed to state a claim against them because, under the Privatization Act, the United States government is the only entity responsible for any alleged misstatements or omissions and because plaintiffs' claims do not meet the requirements of Rule 9(b), F.R.Civ.P. In further support of their motion to dismiss, the underwriter defendants contend that plaintiffs lack standing to bring a § 12(a)(2) claim against them and that plaintiffs' § 12(a)(2) claims should be dismissed to the extent that they have been brought on behalf of purchasers in the after-market.

 There is no merit to USEC's contention that plaintiffs' claims are subject to the pleading requirements of Rule 9(b). As noted herein, a plaintiff is not required under § 11 to plead or prove fraud. *Huddleston*, 459 U.S. at 382, 103 S.Ct. 683.

---

**14.** During argument, counsel for the plaintiffs contended that USEC is not now "a viable company" and is "entering bankruptcy." Defendants vigorously dispute this assertion and note that a cash dividend was recently declared. Although the present financial condition of USEC is not relevant to the issues raised by defendants' pending motions to dismiss, the Court will take judicial notice of published New York Stock Exchange data indicating that during the last year USEC stock has traded at a high of $10.95 a share and a

low of $5.35 a share, with its recent closing price on March 22, 2002 being $6.30 a share.

**15.** Plaintiffs' reliance on *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) is misplaced. That case involved an action brought under § 14(a) of the Securities Exchange Act of 1934 in which the plaintiff claimed that proxies had been solicited in violation of the statute and SEC Rule 14a–9. The "bespeaks caution doctrine" was not discussed anywhere in Justice Souter's majority opinion.

Liability under § 11 is virtually absolute even for innocent misstatements. *Id.*

However, the Court will not address the parties' other arguments advanced in support of and in opposition to the alternative grounds relied upon by the defendants in support of their motions to dismiss. Since the pending motions to dismiss must be granted on grounds of limitations and lack of materiality, there is no need for the Court to consider the other arguments advanced by the defendants.

## VIII

### *Conclusion*

For all the reasons stated herein, this Court concludes that plaintiffs' claims alleged in the amended complaint are barred by limitations and that in any event under the "bespeaks caution" doctrine they should be dismissed because they are not material. Counts I, II and III of the amended complaint must accordingly be dismissed with prejudice. The motion to dismiss of USEC and the individual defendants will therefore be granted. The motion to dismiss of the underwriter defendants will also be granted. An appropriate Order will be entered by the Court.[16] Since the pending motions have not requested that defendants be awarded costs, the Order will provide that the parties on each side should bear their own costs.

---

16. Plaintiffs have requested that they be granted leave to replead in the event that the Court grants defendants' motions. This request will be denied. The amended complaint will be dismissed with prejudice.