UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HOWARD COHEN; MYLES WREN; PAUL
SPIRGEL; AARON BRODY; JACK
LOCKWOOD; DAVID J. STEINBERG;
CHAILE B. STEINBERG; ARTHUR SPINA;
JAY V. GRIMM; IRA SAUL
SCHMOOKLER; FRANCIS SOLOMON;
MENACHEM SKLAR, on behalf of
themselves and all others similarly
situated,

*Plaintiffs-Appellants,*

and

STELLA SHEREMET,

*Plaintiff,*

v.

USEC, INCORPORATED; WILLIAM H.
TIMBERS, JR.; HENRY Z. SHELTON,
JR.; MORGAN STANLEY DEAN
WHITTER COMPANY, INCORPORATED;
MERRILL LYNCH & CO.; JANNEY
MONTGOMERY SCOTT, INCORPORATED;
LEHMAN BROTHERS; PRUDENTIAL
SECURITIES INCORPORATED; SALOMON
SMITH BARNEY; M.R. BEAL &
COMPANY,

*Defendants-Appellees.*

No. 02-1459

HOWARD COHEN; MYLES WREN; PAUL
SPIRGEL; AARON BRODY; JACK
LOCKWOOD; DAVID J. STEINBERG;
CHAILE B. STEINBERG; ARTHUR SPINA;
JAY V. GRIMM; IRA SAUL
SCHMOOKLER; FRANCIS SOLOMON;
MENACHEM SKLAR; STELLA SHEREMET,
on behalf of themselves and all
others similarly situated,
                    *Plaintiffs-Appellees,*

v.

USEC, INCORPORATED; WILLIAM H.                    No. 02-1489
TIMBERS, JR.; HENRY Z. SHELTON, JR.,
                    *Defendants-Appellants,*

and

MORGAN STANLEY DEAN WHITTER
COMPANY, INCORPORATED; MERRILL
LYNCH & CO.; JANNEY MONTGOMERY
SCOTT, INCORPORATED; LEHMAN
BROTHERS; PRUDENTIAL SECURITIES
INCORPORATED; SALOMON SMITH
BARNEY; M.R. BEAL & COMPANY,
                    *Defendants.*

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Harvey II, Senior District Judge.
(CA-01-1858-H, CA-01-1859-H, CA-01-1868-H, CA-01-1869-H,
CA-01-1870-H, CA-01-1871-H, CA-01-1872-H, CA-01-1873-H,
CA-01-1874-H, CA-01-1875-H)

Argued: April 4, 2003

Decided: July 21, 2003

Before NIEMEYER and SHEDD, Circuit Judges, and
James R. SPENCER, United States District Judge for the Eastern
District of Virginia, sitting by designation.

---

Affirmed and remanded by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** Arthur Raphael Miller, Cambridge, Massachusetts, for
Appellants. Daniel Slifkin, CRAVATH, SWAINE & MOORE, New
York, New York; Richard Louis Brusca, SKADDEN, ARPS, SLATE,
MEAGHER & FLOM, L.L.P., Washington, D.C., for Appellees. **ON
BRIEF:** Paul D. Young, Christopher M. Huck, MILBERG, WEISS,
BERSHAD, HYNES & LERACH, L.L.P., New York, New York;
Barbara Podell, BERGER & MONTAGUE, P.C., Philadelphia, Penn-
sylvania; Charles J. Piven, Marshall N. Perkins, LAW OFFICE OF
CHARLES J. PIVEN, Baltimore, Maryland, for Appellants. Robert S.
Bennett, Mary L. Smith, Melissa M. Goldstein, SKADDEN, ARPS,
SLATE, MEAGHER & FLOM, L.L.P., Washington, D.C., for Appel-
lees.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Purchasers of the common stock of USEC, Inc., a producer of
enriched uranium, commenced this class-action against USEC, Inc.,
individual USEC officers, and the lead underwriters in the initial pub-
lic offering of USEC's stock, alleging violations of §§ 11(a), 12(a)(2),
and 15 of the Securities Act of 1933. The complaint alleges that the

registration statement and prospectus filed in connection with the initial public offering misrepresented material facts and omitted to state other facts necessary to make the statements made not misleading. The alleged misrepresentations and omissions related primarily to a new process for producing enriched uranium that USEC intended to employ and to profitability generally.

Pursuant to the defendants' motion, the district court dismissed plaintiffs' complaint as untimely under the one-year statute of limitations contained in § 13 of the Securities Act of 1933. The court also held that the alleged misrepresentations and omissions were not material as a matter of law and that certain of the alleged misrepresentations were mere puffery.

Because the plaintiffs failed to bring their claims within the one-year limitations period set forth in § 13 of the Securities Act of 1933, we affirm. On defendants' cross-appeal relating to sanctions, we remand for findings required by § 27(c) of the Securities Act of 1933.

I

USEC, Inc. was created by Congress through the Energy Policy Act of 1992 primarily to provide uranium enrichment services to transform natural uranium into enriched uranium to be used as fuel for nuclear reactors to produce electricity. USEC produced enriched uranium using the gaseous diffusion process at two government-owned gaseous diffusion plants ("GDPs") located in Kentucky and Ohio. In addition, USEC acted as the executive agent for the United States under a February 1993 government-to-government agreement between the United States and the Russian Federation (the "HEU Contract"), pursuant to which USEC was obligated to purchase from Russia certain components of materials derived from the highly enriched uranium contained in dismantled nuclear weapons of the former Soviet Union.

In April 1996, Congress enacted the USEC Privatization Act, 42 U.S.C. § 2297h, with the purpose of transferring USEC from public to private ownership. The Act authorized the Board of Directors of USEC to privatize the corporation either through an initial public offering (an "IPO") or by having a private corporation acquire it, and

on June 11, 1998, the Board voted unanimously to privatize USEC by means of an IPO. To that end, USEC filed an S-1 Registration Statement with the Securities and Exchange Commission on June 29, 1998, and a prospectus that became effective July 23, 1998. During the IPO, which was held during the period from July 23 through July 28, 1998, USEC sold 100 million shares of common stock at $14.25 per share, raising approximately $1.4 billion.

The prospectus issued in connection with the IPO stated that USEC was "the world leader in the production and sale of uranium fuel enrichment services for commercial nuclear power plants," but the prospectus cautioned that the uranium enrichment industry was "highly competitive," identifying as USEC's major competitors three corporations controlled or operated by foreign governments in Western Europe and Russia. It noted that the industry faced an "excess of production capacity," producing a trend toward lower pricing even as "certain suppliers have announced plans to expand their capacities." Moreover, it explained that USEC's competitors may be less cost-sensitive due to support received by their governmental owners. The prospectus pointed out that USEC was obligated to purchase an agreed-to amount of enriched uranium from Russia under the HEU Contract at a fixed price, and because the market was experiencing declining prices, that fixed price could in the future exceed the price at which USEC could sell the material to its customers. The HEU Contract price was also higher than USEC's cost of producing the same materials at its GDPs. Finally, the prospectus explained that the large quantity of uranium that USEC was obligated to purchase under the HEU Contract reduced the amount of uranium that it needed to produce at its GDPs, resulting in higher per-unit production costs at its GDPs.

Burdened with government-supported competitors in an oversupplied market facing downward price pressure and constrained to some extent by the HEU Contract that could reduce USEC's profitability, USEC set forth in the prospectus a strategy under which it could "continue to be the world's leading supplier of uranium fuel enrichment services." In addition to general strategies of pursuing sales opportunities, improving operating efficiencies, and diversifying over the long term, the prospectus described USEC's strategy of commercializing a new uranium enrichment process called Atomic Vapor

Laser Isotope Separation ("AVLIS") as an alternative to the gaseous diffusion process. The prospectus described USEC's expectation that AVLIS would (1) use only 5-10% of the power used by the GDPs to produce each unit of enriched uranium, (2) require significantly less capital than new centrifuge plants, and (3) use about 20-30% less natural uranium to produce comparable amounts of enriched uranium. And it claimed that AVLIS "should permit USEC to remain one of the lowest cost suppliers . . . and enhance its competitive position."

The prospectus anticipated commercial deployment of AVLIS in 2005, and stated that USEC's exclusive commercial rights to AVLIS gave USEC "a considerable lead-time advantage over others attempting to develop similar laser-based uranium enrichment technology." The prospectus also indicated that USEC "could begin enrichment operations at an AVLIS facility in 2004" and that, by 2006, AVLIS was expected to "displace some or all of the production of the GDPs." Thus, the prospectus identified AVLIS as one of USEC's key competitive advantages, along with favorable arrangements with the U.S. government, large inventories, a strong financial position, and certain advantages flowing from the HEU Contract.

Discussing the risk factors of investment in USEC, the prospectus identified a number of risks associated with AVLIS, noting that "any of these could have a material adverse effect on the Company's financial or competitive position." It stated that "[a]dditional equipment demonstration and testing activities" were necessary before USEC would commit to constructing an AVLIS facility and warned of the possibility of "unanticipated delays or expenditures at this stage." It also stated that "[i]f the Company determines not to proceed with AVLIS deployment, the Company would pursue other options for enrichment services such as GDP upgrades or exploring other new technologies, which could have a material adverse effect on the Company's financial or competitive position."

On June 9, 1999 — less than 11 months after the IPO — USEC issued a press release announcing its abandonment of the AVLIS technology. The press release stated, in relevant part:

> USEC Inc. announced today that it is suspending further development of its AVLIS enrichment technology. USEC's

Board of Directors and management reached this decision after a comprehensive review of operating and economic factors. . . . "[W]e have reexamined the AVLIS technology, performance, prospects, risks and growing financial requirements as well as the economic impact of competitive marketplace dynamics. We now have enough data to conclude that the returns are not sufficient to outweigh the risks and ongoing capital expenditures necessary to develop and construct an AVLIS plant."

The press release also indicated that USEC had spent about $100 million on AVLIS since privatization and that abandonment of the technology would negatively impact the company's financial statements in the short term. It announced that suspension of AVLIS would result in a non-recurring charge of $40 million for the current year.

About a month later, on July 2, 1999, USEC released documents to the Oil, Chemical & Atomic Workers International Union ("OCAW Union") in response to a Freedom of Information Act (FOIA) request made by the OCAW Union the day after the USEC had announced its plans to conduct an IPO. Many of these documents were also made public. The documents eventually released to the public included information on USEC's corporate organization (i.e., bylaws, organization chart, and personnel data); the minutes and transcripts of the June-July 1998 USEC Board meetings; contracts entered into between USEC and lawyers, investment advisors, and consultants; and studies on AVLIS. *OCAW Union v. United States Dep't of Energy*, 141 F. Supp.2d 1, 5 (D.D.C. 2001). By the end of July 1999, the minutes and transcripts of the USEC Board meetings surrounding the decision to conduct an IPO were available to the public. *See Transcripts Show USEC Board Divided on Issuing IPO Last July at $14.25/share*, Nuclear Fuel, July 26, 1999; *Board Minutes Released: Congressmen, Union Critical of USEC Privatization Process*, FreshFUEL, July 26, 1999; *Privatized Uranium Operation Investigated*, The Columbus Dispatch, Aug. 1, 1999. These minutes and transcripts describe in further detail the factors that led the USEC Board to choose an IPO and to pursue AVLIS.

Despite USEC's election to pursue the AVLIS technology, the articles published during July 1999 revealed that the two consortiums

which had offered to buy USEC if it did not proceed on the IPO route were less enthusiastic than USEC's management on AVLIS technology and would have reduced spending on it and delayed its deployment. Quoting the Board meeting transcripts, the *FreshFUEL* article reported that the Board accepted USEC management's view of AVLIS "without regard for the doubt cast on AVLIS by all other bidders and in the absence of admittedly needed independent review of management's claims." A USEC financial adviser attending the meeting at which the Board decided to conduct an IPO dismissed the bidders' views of AVLIS as coming from "professional board spookers" who had an "agenda," i.e., to own USEC. The articles uniformly characterized the Board's decision to proceed with privatization through an IPO as rushed, influenced by the investment bankers, lawyers, and USEC officers who stood to profit from the transaction, and insensitive to the national security implications of the deal. Indeed, USEC's privatization subsequently became the target of widespread criticism by politicians, academics, and national security experts. This criticism led to an investigation by the House Commerce Committee, and testimony was given at a hearing on April 13, 2000, regarding USEC's privatization and its impact on the domestic uranium industry. The Board transcripts were also published at the hearing as part of the congressional investigation.

On October 27, 2000, plaintiff Paul Spirgel commenced a class action against USEC, its responsible officers, and underwriters in the Western District of Kentucky on behalf of a class of persons who purchased USEC stock between July 23, 1998 and December 2, 1999. Spirgel's complaint asserted that USEC's registration and prospectus in connection with the IPO contained false and misleading statements and omissions relating to AVLIS, among other things. Spirgel's complaint was followed by nine identical class actions brought against the same defendants on the same grounds, the latest being filed on January 8, 2001. On defendants' motion, the ten cases were transferred to the District of Maryland pursuant to 28 U.S.C. § 1404(a) and consolidated. The district court then granted the motion of plaintiffs Cohen and Myles to be lead plaintiffs and approved their selection of lead and liaison counsel. The court also ordered the filing of an amended consolidated complaint.

The amended consolidated complaint alleges in three counts (1) that the defendants violated Section 11(a) of the Securities Act (pro-

viding for civil liability for false statements of material fact in a registration statement); (2) that the underwriter defendants violated Section 12(a)(2) of the Securities Act (providing for civil liability for offering or selling a security by means of a prospectus containing a false statement of material fact); and (3) that the individual defendant officers were liable by reason of Section 15 of the Securities Act (providing for joint civil liability of persons controlling a company liable for violations of Section 11 or 12 of the Securities Act). At the core of plaintiffs' allegations were the assertions that:

> [T]he Prospectus was materially false and misleading in that it misrepresented that USEC had a viable core business model, the cornerstone of which was deployment of a new enrichment technology called AVLIS which would enable the Company to reduce its production costs by 50% and profitably compete in the global enriched uranium business. However, at the time of the IPO, USEC had no reasonable prospect or intention of deploying AVLIS. Further, without AVLIS, because USEC had the most antiquated facilities and highest production costs in the industry, its competitive position was precarious at best. Unbeknownst to the public, at a secret USEC Board meeting six weeks before the IPO, USEC's Executive Vice President for Operations George Rifakes conceded: "And we cannot compete with the GDPs. We are going to have trouble competing with the GDPs."

Specifically, plaintiffs alleged that the prospectus misrepresented:

> (1) USEC's ability to profitably produce enriched uranium by falsely stating that the Company was close to deploying a new technology — AVLIS — which would reduce production costs by approximately 50% when in fact AVLIS' viability was unproven and defendants intended to abandon it after the IPO; (2) the costs associated with AVLIS; (3) the impact that the HEU Contract [between the U.S. and Russia] had on USEC's profitability; (4) USEC's plans related to sales of natural uranium; (5) that USEC could profitably produce enriched uranium at the GDPs; (6) USEC's competitive position in the enriched uranium market; and (7) that USEC intended to continue to operate both GDPs.

To satisfy § 13 of the Securities Act, which requires compliance with a statute of limitations as a condition to suit, the complaint alleged that the "facts concerning USEC's business and prospects at the time of the IPO were not disclosed to the investing public until April 13, 2000" at the congressional hearing. Because the first class-action complaint was filed October 27, 2000, plaintiffs asserted that "less than one year elapsed from the time that plaintiffs discovered or reasonably could have discovered these facts and the date of the filing of this action."

On defendants' motion made under Federal Rule of Civil Procedure 12(b)(6), the district court dismissed the complaint, relying on several separate grounds. First, the court held that plaintiffs' claims first filed on October 27, 2000, were time-barred under § 13 of the Securities Act because they were not brought within one year of the time plaintiffs discovered, or should have discovered through the exercise of reasonable diligence, the alleged untrue statements or omissions in the prospectus and registration statement. The court concluded that USEC's June 9, 1999 press release announcing the abandonment of the AVLIS technology — "the cornerstone of USEC's future profitability" — gave plaintiffs actual or constructive notice "of facts suggesting that the prospectus contained misrepresentations or omissions which were actionable under the Securities Act." The court further held that this press release —combined with warnings in the prospectus that USEC's failure to deploy AVLIS "could have a material adverse effect on the Company's financial or commercial position" disclosed the alleged misrepresentations. "With the announcement that AVLIS had been abandoned, the falsity of the statement in the prospectus that it would soon be deployed became apparent, and a cause of action under the Securities Act existed." Even with plaintiffs' allegation that they did not then discover their claims, the court held that an objectively reasonable investor would have discovered the claims:

> Had public information been reviewed by investors during the four month period between June 9, 1999 and October 26, 1999, the exercise of reason and due diligence by plaintiffs would have revealed the existence of the alleged untrue statements and omissions, and the *Spirgel* complaint could

have been filed at an earlier date when it was not time barred.

The court held alternatively that, based on our holding in *Brumbaugh v. Princeton Partners*, 985 F.2d 157 (4th Cir. 1993), plaintiffs' claims were time-barred because the prospectus itself put them on inquiry notice of their claims more than one year prior to the filing of their complaint.

In addition to dismissing the complaint on the statute of limitations, the court held that many of the alleged misrepresentations identified by plaintiffs are not actionable because they were merely predictive statements and puffery. It also held that, to the extent statements could be viewed as misrepresentations, they were not actionable under the "bespeaks caution" doctrine. "Under the so-called 'bespeaks caution' doctrine, claims of securities fraud are . . . subject to dismissal if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions." After listing the extensive cautionary statements in the prospectus and discussing their relation to the alleged misrepresentations, the court concluded:

> this case, there is not a substantial likelihood that the disclosure of the alleged actual or omitted facts would have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available. Had a reasonable shareholder read the prospectus in its entirety, including the extensive cautionary language contained therein, the alleged untrue facts and the alleged omitted facts would not have assumed actual significance in the shareholders' deliberations.

From the district court's order of dismissal, the plaintiffs filed this appeal. The defendants cross-appealed because the district court failed to make findings under Federal Rule of Civil Procedure 11(b), as required by 15 U.S.C. § 77z-1(c)(1).

II

The plaintiffs' complaint was brought under §§ 11(a), 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act" or "Act"). Sec-

tion 11(a) provides that when a *registration statement* contains "an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading," a person unaware of the misrepresentations or omissions who purchases the security may bring an action in any court against parties including "every person who signed the registration statement," every director or partner in the issuer at the time of the statement's filing, and "every underwriter with respect to such a security." 15 U.S.C. § 77k(a). Section 12(a)(2) makes liable to the purchaser of a security "[a]ny person who offers or sells [the] security . . . by means of a *prospectus* or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission)." 15 U.S.C. § 77*l*(a)(2) (emphasis added). Finally, § 15 of the Act provides for *joint and several liability* of every person who "controls any person liable under sections [11 or 12]." 15 U.S.C. § 77o. All of these claims are subject to the statute of limitations set forth in § 13 of the Act which provides:

> No action shall be maintained to enforce any liability created under section [11 or 12(a)(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.

15 U.S.C. § 77m. Because § 13 of the Act "conditions [the Act's] enforcement on commencement of the action within specified time periods, the plaintiff bears the burden of establishing that his action meets the statutory requirements [, and it] is the general rule that in these circumstances the plaintiff must plead and prove facts that show that his action was filed within the time periods specified by statute." *Caviness v. Derand Resources Corp.*, 983 F.2d 1295, 1302 (4th Cir. 1993).

In this case, the plaintiffs alleged satisfaction of the limitations condition in their complaint, asserting that they did not discover their claims until April 13, 2000, when portions of the transcripts of the Board meetings in June and July 1998 were made public at the con-

gressional hearing, revealing "for the first time why the Prospectus' representations regarding, among other things, AVLIS, the competitive position of USEC and the impact of HEU Contract on USEC were materially false and misleading." Based on that assertion, they alleged that their complaint filed on October 27, 2000, was timely.

The district court disagreed and concluded as a matter of law that, based on materials incorporated into the complaint, plaintiffs were imputed with knowledge of their claims when the June 9, 1999, press release was issued by the defendants announcing the abandonment of the AVLIS technology. The court concluded that that press release, coupled with the prospectus, informed plaintiffs of the misrepresentations or omissions on which their complaint rests. The court concluded alternatively that the information undoubtedly put the plaintiffs on inquiry notice giving rise to a duty to conduct a reasonable investigation and that that investigation would have revealed shortly — certainly within four months — the misrepresentations and omissions alleged in the complaint. The court pointed out that information made public in connection with the OCAW Union litigation under the Freedom of Information Act and other related litigation included the very transcripts to which the plaintiffs pointed as their source of discovery of the misrepresentations and omissions at issue in this case.

On appeal, the plaintiffs contend that it was improper for the district court to have decided this case on a motion to dismiss because there was a factual dispute concerning when plaintiffs should have discovered the existence of the alleged misrepresentations and omissions. They also argue that the information imputed to them in June and July 1999 was insufficient to put them on notice of their claims.

We agree with the district court that sufficient facts were revealed in June and July 1999 to put the plaintiffs on actual or constructive notice of their claims. At the very least, discovery of their claims can be imputed to them on the basis that by October 1999, they *should have* discovered their claims with the exercise of reasonable diligence. The documents incorporated into the complaint by reference or by reliance show that an objectively reasonable investor would have discovered the misrepresentations relied on by plaintiffs in the

June-July 1999 time period, making their complaint filed in October 2000 untimely under § 13 of the Securities Act.

The misstatements on which the plaintiffs relied in their complaint are:

> (1) USEC's ability to profitably produce enriched uranium by falsely stating that the Company was close to deploying a new technology — AVLIS — which would reduce production costs by approximately 50% when in fact AVLIS' viability was unproven and defendants intended to abandon it after the IPO; (2) the costs associated with AVLIS; (3) the impact that the HEU Contract had on USEC's profitability; (4) USEC's plans related to the sales of natural uranium; (5) that USEC could profitably produce enriched uranium at the GDPs; (6) USEC's competitive position in the enriched uranium market; and (7) that USEC intended to continue to operate both GDPs.

These alleged misstatements center on an assertion that USEC failed to disclose to investors that the company had "no reasonable prospect or intention of deploying AVLIS," which plaintiffs characterize as the "cornerstone" of USEC's "core business model." Plaintiffs' complaint reveals their position that they invested in USEC because of the competitive advantage that USEC was hoping to gain from the new AVLIS technology. The registration statement and prospectus portrayed a gloomy economic future for USEC in the uranium reprocessing market if AVLIS did not live up to the stated expectations of near-term viability, as prices and demand were declining and capacity was increasing. This is all disclosed in the prospectus.

In this context, when USEC disclosed that it was abandoning the AVLIS technology and taking a material and substantial financial write-down, that fact coupled with the disclosures made in the prospectus regarding the prospects of profitability without AVLIS revealed the truth about the misstatements alleged in the complaint. For example, USEC is alleged to have represented that it was "close to deploying a new technology — AVLIS," yet when the company announced abandonment of AVLIS, the alleged falsity of that statement is revealed. Similarly, the plaintiffs complained about not being

advised of the costs of AVLIS, yet that cost was revealed in June 1999. The dependence on AVLIS to advance a business model of profitability made abandonment of the technology a forecast of unprofitability. Indeed, USEC's prospectus admitted the difficulty in remaining competitive without AVLIS, i.e., continuing operations only with the two existing GDPs. Finally, any question about the viability of AVLIS was put to rest with the announcement of its abandonment in the press release. When a company jettisons the technology that serves as the *raison d'etre* of its core business model only months after the company's IPO, the misleading nature of sunny expectations set forth in the prospectus regarding that technology are revealed.

Even if the information given in the press release were not enough to put plaintiffs on notice of their claims, however, the dramatic abandonment of AVLIS should have caused an objectively reasonable investor to investigate, and in this case discover, the further details surrounding USEC's decision to abandon AVLIS. Yet, the plaintiffs failed to conduct any investigation in this case. Had they done so, they would have discovered the numerous documents made public in the OCAW Union litigation as well as trade journal articles in July and August 1999, particularly in *Nuclear Fuel*, *FreshFUEL*, and *The Columbus Dispatch*. While these may not be mainstream publications that an interested investor might read on a casual basis, the inquiry notice prompted by the press release would have directed them to a search that would have revealed the details. We agree with the district court that any such inquiry would have revealed these additional materials within a few months after June 1999, certainly before October 1999, making a lawsuit filed on October 27, 2000, untimely.

In sum, for the reasons given and the reasons more completely articulated by the district court in its limitations rulings, we affirm the district court's ruling dismissing plaintiffs' claims for failure to meet the statute of limitations requirement of § 13 of the Securities Act.

## III

On cross-appeal, the defendants argue that the district court erred in failing to make Rule 11(b) findings expressly required by the Private Securities Litigation Reform Act, 15 U.S.C. § 77z-1(c)(1)

("[T]he court *shall* include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b)") (emphasis added). *See also Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001) ("Because the district court did not make the necessary Rule 11 findings, we remand for this purpose."); *Gurary v. Winehouse*, 190 F.3d 37, 47 (2d Cir. 1999) ("As the statute required the district court to make findings, we have no choice but to remand in order to permit it to do so"). The defendants seek a remand to have the court make those findings.

The plaintiffs oppose a remand, relying on a footnote analysis in *Dellastatious v. Williams*, 242 F.3d 191 (4th Cir. 2001). But *Dellastatious* is distinguishable. There, defendants cross-appealed after the district court denied their motion for sanctions without making any findings. We concluded that "[b]ecause the PSLRA 'does not in any way purport to alter the substantive standards for finding a violation of Rule 11,' and because our own review of the record provides no basis for awarding sanctions in this instance, a remand here would be unnecessary." *Id.* at 197 n.5 (citation omitted). Unlike here, the district court in *Dellastatious* addressed the issue of sanctions, even if it did not elaborate the findings supporting its ruling.

Because the statute commands that such findings be made, we remand this case for that purpose. In doing so, however, we express no opinion on whether sanctions are, in fact, appropriate.

*AFFIRMED AND REMANDED*